EL PUEBLO DE PUERTO RICO, apelado, *v.* ISABEL MELÉNDEZ RODRÍGUEZ, ISIDORO MONTES TORRES, acusados y apelantes.

*Números:* CR-88-72  CR-88-94          *Resueltos:* 13 de julio de 1994

*Arturo Negrón García* y *Alberto Colón Bermúdez*, abogados de los apelantes; *Jorge E. Pérez Díaz, Procurador General, Norma Cotti Cruz, Subprocuradora General,* y *Eunice Amaro Garay, Procuradora General Auxiliar*, abogados de El Pueblo.

EL JUEZ PRESIDENTE SEÑOR ANDRÉU GARCÍA emitió la opinión del Tribunal.

Mediante este recurso los apelantes Isabel Meléndez Rodríguez e Isidoro Montes Torres impugnan la admisión de cierta prueba que se obtuvo mediante un allanamiento que, según ellos, fue ilegal. Se fundamentan en que la orden no cumple con el requisito de particularidad y que su expedición descansó en información que se obtuvo en violación a su expectativa razonable de intimidad. Además, la coapelante Meléndez Rodríguez alega que no se estableció

el elemento de posesión más allá de duda razonable para sostener sus convicciones por infracciones a la Ley de Armas de Puerto Rico, 25 L.P.R.A. sec. 411 *et seq.*, y al Art. 168 del Código Penal, 33 L.P.R.A. sec. 4274.

## I

Según surge de la transcripción de la prueba y de los autos del caso, la División de Control del Vicio de la Policía de Puerto Rico, Área de Ponce, recibió una confidencia telefónica anónima, la cual informaba que en el apartamento Núm. 448 del bloque Núm. 29 del Residencial Dr. Pila de Ponce se estaba recogiendo y cuadrando material de bolita. Además, el confidente indicó que el dueño del apartamento, Sr. Isidoro Montes (coapelante en el caso de autos), tenía un vehículo marca Oldsmobile, tablilla ABH–176, y se dedicaba a cuadrar bolita los martes y sábados en dicho apartamento. Se informó también que el individuo que recogía y llevaba el material de bolita al apartamento Núm. 448 utilizaba un auto marca Malibú, color marrón, cuya tablilla terminaba con el Núm. 873.

Como resultado de dicha confidencia, la División de Control del Vicio en Ponce asignó la investigación al agente Juan R. Galarza Dávila. Para corroborar la confidencia, el agente Galarza montó vigilancia frente al bloque Núm. 29 el martes 25 de febrero de 1986 a las 7:30 de la noche. Allí observó el automóvil marca Oldsmobile, de 1986, tablilla ABH–176. Una (1) hora más tarde, el agente vio llegar el vehículo marca Malibú, color marrón, modelo de 1974, tablilla Núm. 54X873.([1]) El automóvil se estacionó frente al bloque Núm. 29. Un individuo trigueño, bajito y de aproximadamente veintiocho (28) años se bajó del vehículo y llevaba una bolsa de papel estraza. Luego de ver que comen-

---

([1]) El agente corroboró la confidencia en cuanto a los tres (3) últimos dígitos de la tablilla del Malibú, debido a que la confidencia no había incluido los primeros tres (3) números.

zaba a subir las escaleras del bloque Núm. 29, el agente subió las escaleras del bloque Núm. 30, el cual queda de frente al bloque Núm. 29. Se detuvo en el segundo piso y desde allí el agente observó que la persona —quien se había bajado del Malibú— llegó al apartamento Núm. 448, tocó a la puerta y una mujer de aproximadamente veinticinco (25) años de edad, blanca, con pelo lacio, abrió la puerta y un portón de rejas. Durante el juicio el agente Galarza identificó a dicha mujer como la coapelante Isabel Meléndez Rodríguez. E.N.P., pág. 1. El individuo entró al apartamento Núm. 448 y el portón y la puerta fueron cerradas.

Consiguientemente, el agente se dirigió al bloque Núm. 29 y subió hacia el apartamento Núm. 448. Allí "procedió a acercarse hacia la puerta del apartamento y al así hacerlo pudo escuchar cuando una voz de hombre decía trescientos veinticionco [sic] (325) y una voz de mujer le contestaba con cinco, y el hombre decía 326 y la mujer contestaba con diez (10) y así seguían correlativamente". E.N.P., pág. 1. Véase, también, la Resolución de 21 de octubre de 1987 emitida por el Tribunal Superior, Sala de Ponce (Hon. José M. Ayala Cádiz, Juez).[2]

Posteriormente, el agente se retiró del frente de la puerta del apartamento, se situó en otro lugar y, aproximadamente treinta y cinco (35) minutos después, vio salir al mismo hombre del apartamento y montarse en el vehículo marca Malibú. Más tarde, el individuo llegó de nuevo en el Malibú y, luego de estacionarse en el mismo lugar, subió al apartamento con un sobre manila en las manos. Al igual que en la ocasión anterior, la mujer antes descrita le abrió la puerta y el portón.

Aproximadamente una (1) hora más tarde, llegó al lugar

---

[2] El agente Galarza testificó que en esta primera ocasión en que se acercó al apartamento "tenía el propósito de corroborar la confidencia. Se acercó para corroborar lo del apartamento 448, para asegurarse". E.N.P., pág. 5, según enmendada.

un individuo en un automóvil marca Toyota, quien entró al apartamento y bajó diez (10) minutos después.

El agente Galarza se dirigió a las oficinas de la División de Control del Vicio, cambió de auto y regresó al lugar. A eso de las 12:15 de la madrugada pudo observar a un individuo, quien llegó en un *Jeep.* Dicho individuo tocó bocina y del balcón del apartamento Núm. 448 salió una persona quien, mediante señas, le indicó al individuo que se encontraba en el *Jeep* que esperara. La persona bajó del apartamento y llegó hasta el *Jeep.* El individuo, quien se hallaba en el automóvil, le entregó una bolsa de papel al otro y dijo: "Aquí está el material de Villalba." La otra persona tomó la bolsa y subió otra vez al apartamento.[3] A eso de las 12:30 A.M., el agente Galarza se retiró del lugar.

El sábado 1ro de marzo de 1986 el agente Galarza montó nueva vigilancia. Ese día pudo observar que el individuo del Malibú se montó en dicho automóvil, el cual se hallaba estacionado cerca del bloque Núm. 29, y se retiró del lugar. Media hora más tarde, éste regresó con un sobre manila y entró al apartamento Núm. 448. De nuevo, el agente Galarza se dirigió al apartamento Núm. 448 y "con el propósito específico de escuchar lo que allí se podía estar hablando se acercó a la puerta y pudo escuchar al igual que la vez anterior que cantaban números correlativamente, pero esta vez únicamente pudo escuchar voz de hombre ... que uno cantaba números y otro indicaba la cantidad". E.N.P., págs. 2 y 5, según enmendada.[4]

Esa noche el agente observó más personas que llevaban paquetes en sus manos y salían del edificio sin ellos. A eso de las 10:00 P.M., el agente Galarza se retiró del lugar "con-

---

[3] Véase la declaración jurada del agente Galarza y la Resolución de 21 de octubre de 1987, pág. 5. El agente Galarza identificó a dicha persona como el individuo quien conducía el vehículo marca Malibú. E.N.P., pág. 2, según enmendada.

[4] Véase también la Resolución de 21 de octubre de 1987 del Tribunal Superior, Sala de Ponce.

vencido de que en dicho apartamento se estaba violand[o] la Ley de Bolita". E.N.P., pág. 2.

El agente virtió los hechos expuestos antes en una declaración jurada, la cual sirvió de base para la expedición de una orden de allanamiento. Así, pues, éste se realizó y se ocupó cantidades considerables de evidencia delictiva relacionada con el juego ilegal de la bolita (listas madres medianas y pequeñas, libreta de deudas y pagos, máquina de sumar, lápices, etc.). También se ocupó dinero —veintiséis mil noventa y nueve dólares ($26,099) en efectivo y dos mil ochocientos treinta dólares con setenta centavos ($2,830.70) en cheques— un revólver, una pistola con el número de serie mutilado y un rifle cargado. Ambos coapelantes se encontraban en el apartamento al momento del allanamiento.

Así las cosas, el Ministerio Público formuló las acusaciones contra los codemandados apelantes por infracciones a los estatutos siguientes: (a) Sec. 10 de la Ley Núm. 220 de 15 de mayo de 1984, según enmendada, 33 L.P.R.A. sec. 1255, mejor conocida como la Ley de la Bolita; (b) Art. 168 del Código Penal, *supra*, y (c) Arts. 6 y 11 de la Ley de Armas de Puerto Rico, 25 L.P.R.A. secs. 416 y 421. Celebrado el juicio por tribunal de derecho, se encontró a ambos acusados culpables por infracción a los Arts. 6 y 11 de la Ley de Armas de Puerto Rico, *supra*, y al Art. 168 del Código Penal, *supra*. Al coacusado Isidoro Montes Torres se le encontró culpable, además, de violar la Sec. 10 de la Ley de la Bolita, *supra*.

II

La prueba del Ministerio Público consistió en los testimonios de los agentes Juan R. Galarza y Orlando Ortiz Soto.[5] Se presentó, además, la prueba ocupada durante el

---

(5) El primero participó en la investigación y en el allanamiento. El segundo tomó parte sólo en el allanamiento.

allanamiento. La defensa estipuló la identificación de dicha evidencia, mas no así su admisibilidad, siendo ésta objetada mediante moción de supresión de evidencia. Dicha moción, sin embargo, fue declarada sin lugar por el juez de instancia.

Los convictos apelantes recurren ante nos y plantean los errores siguientes:

A. Erró el Honorable Tribunal de Instancia al admitir la evidencia producto de un allanamiento y con la cual se sostuvieron los cargos imputados por los siguientes fundamentos:

1. La orden de allanamiento bajo cuya autoridad se ocupó la evidencia que sostuvo los cargos imputados es nula en derecho por no describirse en la misma, ni en la declaración jurada que dio lugar a su expedición los objetos o cosas a ocuparse durante el allanamiento en violación al requisito de particularidad contemplado en la Sección 10 del Artículo II de la Constitución del Estado Libre Asociado de Puerto Rico y en la Cuarta Enmienda de la Constitución de los Estados Unidos.

2. Que los hechos esenciales en los cuales se basó el Magistrado que expidió la orden de allanamiento para la determinación de causa probable que exige el mandato constitucional son el producto de una intrusión o transgresión en relación a la expectativa razonable de privacidad a que tiene derecho todo ciudadano y que protege la Cuarta Enmienda de la Constitución de los Estados Unidos y el Artículo II de la Constitución del Estado Libre Asociado de Puerto Rico.

B. Que no se estableció más allá de duda razonable que la apelante [Meléndez Rodríguez] ostentaba la posesión y dominio de las armas que se ocuparon durante el allanamiento y que dieron lugar a las convicciones por infracciones a la Ley de Armas de Puerto Rico y al Artículo 168 del Código Penal de Puerto Rico. Informe del Procurador General, pág. 8.

## III

Los apelantes sostienen que durante la etapa investigativa el agente Galarza les violó su expectativa razonable de intimidad al escuchar conversaciones incriminatorias mientras estaba en el área inmediatamente fuera de la puerta de entrada del apartamento en el Residencial Dr. Pila de Ponce. Se apoyan en la protección contra registros y

allanamientos irrazonables que establece el Art. II, Sec. 10 de nuestra Carta de Derechos, Const. E.L.A., L.P.R.A., Tomo 1, y la Cuarta Enmienda de la Constitución federal, L.P.R.A., Tomo 1.

La Sec. 10 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico, *supra*, ed. 1982, pág. 299, dispone que "[n]o se violará el derecho del pueblo a la protección de sus personas, casas, papeles y efectos contra registros, incautaciones y allanamientos irrazonables". Para lograr ese principio fundamental de convivencia, esta sección añade que "[s]ólo se expedirán mandamientos autorizando registros, allanamientos o arrestos por autoridad judicial, y ello únicamente cuando exista causa probable apoyada en juramento o afirmación, describiendo particularmente el lugar a registrarse, y las personas a detenerse o las cosas a ocuparse". Íd. Finalmente, a diferencia de la Constitución federal, nuestra Carta de Derechos dispone expresamente que la evidencia que se obtenga en violación a la Sec. 10 "será inadmisible en los tribunales". Íd.

Uno de los propósitos fundamentales de estas disposiciones constitucionales es proteger la dignidad y la intimidad de los ciudadanos. *Pueblo v. Rivera Colón*, 128 D.P.R. 672 (1991); *Pueblo v. Martínez Torres*, 120 D.P.R. 496, 500 (1988); *E.L.A. v. Coca Cola Bott. Co.*, 115 D.P.R. 197, 207 (1984). Ya en *Pueblo v. Dolce*, 105 D.P.R. 422, 428 (1976), este Tribunal reconoció que nuestra Constitución gozaba de vitalidad independiente y bajo esa autoridad hemos interpretado las protecciones contra los registros y allanamientos irrazonables de forma más amplia que la casuística norteamericana. *Pueblo v. Rivera Colón*, supra; *Pueblo v. Malavé González*, 120 D.P.R. 470, 475–476 (1988); *Pueblo v. Falú Martínez*, 116 D.P.R. 828, 837 (1986); *Pueblo v. Lebrón*, 108 D.P.R. 324, 327 (1979). Además, hemos afirmado que la garantía constitucional contra los registros y allanamientos irrazonables "debe examinarse exclusivamente a la luz de la Sec. 10, del Art. II, de

nuestra Constitución, *supra*". *Pueblo v. Rivera Colón*, supra, pág. 679. Resolvemos conforme a estos principios. No obstante, recurriremos inicialmente a la jurisprudencia constitucional del Tribunal Supremo federal para exponer el contenido mínimo de dicha protección y a la casuística de otros tribunales norteamericanos para presentar situaciones fácticas similares a las del caso de autos.

■ A. La Cuarta Enmienda de la Constitución de Estados Unidos de Norteamérica, *supra*, ed. 1982, pág. 186, establece que "[n]o se violará el derecho del pueblo a la seguridad de las personas, hogares, documentos y pertenencias, contra registros y allanamientos irrazonables".

■ En *Katz v. United States*, 389 U.S. 347 (1967), el Tribunal Supremo federal estableció el criterio de la expectativa razonable de intimidad para determinar cuándo se había realizado un registro o allanamiento para propósitos de la Cuarta Enmienda, abandonando así la vieja doctrina del *trespass*.

Más adelante quedó claro que la Cuarta Enmienda protege a los seres humanos y no a los lugares. Así, el Tribunal Supremo federal resumió la doctrina sentada en *Katz v. United States*, supra, al decir que "capacity to claim the protection of the Fourth Amendment depends not upon a property right in the invaded place but upon whether the person who claims the protection of the amendment has a legitimate expectation of privacy in the invaded place". *Rakas v. Illinois*, 439 U.S. 128, 143 (1978).

Posteriormente, en *Smith v. Maryland*, 442 U.S. 735, 740 (1979), el Tribunal Supremo de Estados Unidos adoptó el criterio dual que había sugerido el Juez Harlan en su opinión concurrente en *Katz v. United States*, supra: "The first is whether the individual, by his conduct, has 'exhibited an actual (subjective) expectation of privacy,' .... The second question is whether the individual's subjective expectation of privacy is one that society is prepared to recognize as 'reasonable'." Véase, también, *California v. Ci-*

*raolo*, 476 U.S. 207, 211 (1986). En cuanto a la segunda fase o pregunta, el Tribunal expresó que "[t]he test of legitimacy is not whether the individual chooses to conceal assertedly 'private' activity", si no más bien "whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment". *Oliver v. United States*, 466 U.S. 170, 182–183 (1984); *California v. Ciraolo*, supra, pág. 211.

■ A base del criterio de expectativa razonable de intimidad expuesto en *Katz v. United States*, supra, y su progenie, se amplió el alcance de la Cuarta Enmienda "más allá del interior de la residencia para incluir también a la zona contigua a la casa, compuesta por el terreno y las estructuras accesorias. Esa zona es conocida como la 'inmediación' o el *curtilage*". *Pueblo v. Rivera Colón*, supra, pág. 683, y casos allí citados.[6]

■ En *United States v. Dunn*, 480 U.S. 294, 301 (1987), el Tribunal Supremo federal esbozó cuatro (4) criterios que determinan la extensión del *curtilage*:

1. La proximidad de la casa a la zona que se alega compone el *curtilage*. Si la zona está muy próxima a la casa o residencia, este hecho por sí sólo hace mucho más probable que el área sea considerada como *curtilage*.

2. Si el área se encuentra dentro de los linderos de la casa.

3. La naturaleza y uso que se le da a esa zona.

4. Las medidas que haya tomado el residente para proteger esta zona de observaciones que puedan hacer los transeúntes que pasen por allí.

■ La decisión de *Katz v. United States*, supra, y los casos subsiguientes han servido como fundamento para re-

---

(6) El profesor Chiesa define el *curtilage* como "el área a la cual se extiende la actividad íntima asociada con la santidad del hogar y la vida privada". E.L. Chiesa, *Derecho procesal penal de Puerto Rico y de Estados Unidos*, Colombia, Ed. Forum, 1991, Sec. 6.16, pág. 432.

solver controversias federales y estatales con hechos parecidos, aunque no idénticos, a los del caso de autos. La doctrina predominante en esas jurisdicciones es que "cuando un agente gubernamental descubre alguna información mediante el uso de uno o más de sus sentidos mientras está legítimamente presente en el lugar desde donde hace uso de esos sentidos, esa detección no es un 'registro' para propósitos de la Cuarta Enmienda". (Traducción nuestra.) W.R. LaFave, *Searches and Seizures: A Treatise on the Fourth Amendment*, 2da ed., Minnesota, Ed. West Publishing Co., 1987, Vol. 1, Sec. 2.2(a), pág. 320, y casos allí citados. Esta norma no ha sido alterada cuando se trata de actividades de agentes en condominios o edificios de viviendas múltiples.

El Profesor LaFave plantea el problema y expone la norma de mayoría:

> ... [W]hat is different about the multiple-occupancy dwelling cases generally is that an occupant can claim an exclusive privacy interest in only a portion of the premises, and areas immediately adjacent to that portion will be open to public or common usage, *so that courts are inclined to view those occupying such dwellings as having a reduced privacy expectation.* (Énfasis suplido.) LaFave, *op. cit.*, Sec. 2.3(c), pág. 395. Véanse, también: *State v. Brown*, 503 A.2d 566, 570 (1986); *State v. Benton*, 536 A.2d 572, 575 (1988).[7]

■ Todos los tribunales norteamericanos parecen estar de acuerdo en que lo que los agentes puedan escuchar *sin la ayuda de equipo mecánico o electrónico* no está pro-

---

[7] Una decisión reciente de un tribunal de Nueva York revela que esta norma, aunque aún sólidamente arraigada, está perdiendo alguna fuerza. En *People v. Garriga*, 596 N.Y.S.2d 25 (1993), se resolvió que los pasillos comunes de una casa de hospedaje, cuyos inquilinos tienen cuartos privados pero comparten las facilidades de baños y cocina, son parte de la vivienda del inquilino para propósitos de la Cuarta Enmienda. El tribunal reconoció que los acusados tenían una expectativa razonable de intimidad y señaló que:

"...[I]t is economic necessity that requires those who live in such humble circumstances to dwell there. That they cannot afford to have their own kitchens and bathrooms, and hallway access thereto, does not render such areas 'public' with respect to the constitutional prerequisites for permissible entry by the police." *People v. Garriga*, supra, pág. 29.

tegido por la Cuarta Enmienda.[8] El fundamento que se utiliza de manera frecuente para llegar a esta conclusión es en cuanto a que las conversaciones llevadas en un tono de voz que se pueda escuchar fuera de la vivienda son conversaciones necesariamente expuestas al público y, por lo tanto, no gozan de una expectativa razonable de intimidad.[9] La norma es la misma aun cuando el agente haya puesto su oreja en la puerta o pared para escuchar lo que se diga adentro.[10]

Ahora bien, la ausencia de uso de equipo mecánico o electrónico para escuchar conversaciones en una vivienda o en un cuarto de hotel no resuelve el problema de si hubo un registro para fines de la Cuarta Enmienda. Para ello las cortes norteamericanas han hecho distinciones entre condominios de acceso restringido y condominios de acceso público. Véase *Lorenzana v. Superior Court of Los Angeles County*, 511 P.2d 33, 35 (Cal. 1973). La norma prevaleciente es que las conversaciones hechas dentro de una vivienda, que sean escuchadas por un agente desde pasillos o áreas comunes de condominios o edificios de vivienda múltiple, no gozarán de una expectativa razonable de intimidad cuando el acceso a estos pasillos o áreas comunes no ha sido restringido al público en general.[11]

---

[8] Esto es así, ya sea cuando la conversación proviene de cuartos en hoteles y moteles: *U.S. v. Hessling*, 845 F.2d 617, 619 (6to Cir. 1988); *United States v. Mankani*, 738 F.2d 538, 542 (2do Cir. 1984); *United States v. Agapito*, 620 F.2d 324, 330–331 (2do Cir. 1980); *State v. Moses*, 367 So. 2d 800, 803 y 804 (1979); *State v. Day*, 362 N.E.2d 1253 (1976); *United States v. Fisch*, 474 F.2d 1071, 1077 (9no Cir. 1973); *United States v. Ortega*, 471 F.2d 1350, 1361 (2do Cir. 1972)); o de apartamentos en condominios o edificios de vivienda múltiple: *United States v. Llanes*, 398 F.2d 880 (2do Cir. 1968); *United States v. Moore*, 463 F. Supp. 1266, 1270 (S.D.N.Y. 1979); *State v. Benton*, 536 A.2d 572, 574 (1988); *People v. Foster*, 97 Cal. Rptr. 94, 97 (1971); *State v. Kuznitz*, 250 A.2d 802, 804 (N.J. 1969).

[9] Véanse, por ejemplo: *State v. Moses*, supra, pág. 804; *U.S. v. Hessling*, supra, pág. 619.

[10] Véanse: *U.S. v. Hessling*, supra; *United States v. Mankani*, supra, pág. 541; *United States v. Agapito*, supra, pág. 330; *United States v. Moore*, supra, pág. 1270.

[11] *People v. Shorty*, 731 P.2d 679, 682 (Colo. 1987); *State v. Seagull*, 632 P.2d 44, 47 (Wash. 1981); *State v. Crea*, 233 N.W.2d 736, 739 (1975); *Commonwealth v. Dinnall*, 314 N.E.2d 903, 904 (1974); *Lorenzana v. Superior Court of Los Angeles County*, 511 P.2d 33 (La. 1973); *Pate v. Municipal Court for Modesto Judicial Dis-*

Cuando, por el contrario, el agente escuche conversaciones desde pasillos o áreas comunes en edificios de viviendas o condominios *no abiertos al público en general*, los tribunales han resuelto que existirá una expectativa razonable de intimidad que protege al residente.([12]) No obstante, otros tribunales han resuelto que no existe una expectativa razonable de intimidad en pasillos y áreas comunes de un condominio, aun cuando su acceso esté restringido, pues el residente puede prever que por esas áreas transitan otros residentes, sus invitados, trabajadores y otras personas cuyo acceso no está restringido. *United States v. Moore*, 463 F. Supp. 1266, 1270 (N.Y. 1979).

Algunos foros han utilizado el concepto de *curtilage* cuando analizan problemas de expectativa razonable de intimidad en condominios o complejos de viviendas múltiples. Por ejemplo, en *Bunn v. State*, 265 S.E.2d 88 (1980), tras una confidencia de que un residente portaba una arma, unos agentes entraron legalmente al patio trasero de un complejo de vivienda. Dicho patio no estaba cercado. En la unidad de acondicionador de aire localizada inmediatamente fuera del apartamento del sospechoso, los agentes ocuparon el arma a la que se refería la confidencia. El tribunal expresó que el dueño o arrendador de un apartamento en el estado de Georgia tiene una expectativa razonable de intimidad en el *curtilage* que rodea su apartamento. Íd., pág. 91. Adujo el tribunal que "whenever

---

*trict*, 89 Cal. Rptr. 893 (1970); *State v. Kuznitz*, supra, pág. 804; W.R. LaFave, *Searches and Seizures: A Treatise on the Fourth Amendment*, 2da ed., Minnesota Ed. West Publishing Co., 1987, Vol. 1, Sec. 2.3(c), pág. 397.

([12]) *United States v. Fluker*, 543 F.2d 709, 716 (9no Cir. 1976); *United States v. Carriger*, 541 F.2d 545, 552 (6to Cir. 1976); *State v. Reddick*, 541 A.2d 1209 (1988); *State v. Brown*, 503 A.2d 566, 570 (1986); *United States v. Booth*, 455 A.2d 1351, 1354 (App. 1983); *People v. Beachman*, 296 N.W.2d 305, 308 (1980); *People v. Trull*, 380 N.E.2d 1169, 1173 (1978); *Commonwealth v. Hall*, 323 N.E.2d 319 (1975); *Garrison v. State*, 345 A.2d 86 (1975); *State v. Di Bartolo*, 276 So. 2d 291 (1973). Además, se ha resuelto que constituye un "registro" bajo la Constitución del estado de Massachusetts cuando un agente escucha las conversaciones incriminatorias del residente de un condominio desde un lugar que no está accesible ni al público ni a los otros residentes de la vivienda. Ello es así porque el residente poseía una expectativa razonable de intimidad bajo esos hechos. *Com. v. Panetti*, 547 N.E.2d 46 (1989).

government agents enter upon the curtilage they necessarily intrude upon the individual's expectation of privacy". Íd. Por lo tanto, el tribunal resolvió:

> Because a tenant in an apartment expects other tenants and their invitees to enter the common area of the apartment complex they have no reasonable expectation of privacy therein. Accordingly, in the instant case, the invited police officers were lawfully in the common area but were without probable cause to intrude into the "immediate vicinity" of the defendant's patio at the rear of his apartment. *Bunn v. State*, supra, pág. 91.

Por otro lado, en *People v. Shorty*, 731 P.2d 679 (Colo. 1987), un agente recibió confidencias de que el acusado vendía drogas en su apartamento. Durante la investigación, el oficial entró a la estructura y bajó por unas escaleras que llegaban únicamente a la puerta del acusado. Allí tocó a la puerta. Al no recibir ninguna contestación, el agente levantó el felpudo que estaba puesto frente a la puerta y encontró narcóticos debajo de éste. Al resolver que la actuación del agente no violó la Cuarta Enmienda, el tribunal expresó que el hecho de que el registro ocurra dentro del *curtilage* no resuelve la controversia cuando, como en este caso, la accesibilidad pública al lugar registrado frustre cualquier expectativa razonable de intimidad. *People v. Shorty*, supra, pág. 681.

En su opinión disidente, el Juez Quinn expresó que:

> In determining whether society is prepared to recognize one's expectation of privacy as "reasonable" for constitutional purposes, it is appropriate to test the expectation "against the customs, values and common understanding that confer a sense of privacy upon many of our social activities". (Citas omitidas.)[13]
> *People v. Shorty*, supra, pág. 685.

---

[13] Al opinar que al acusado le cobijaba una expectativa razonable de intimidad, el juez disidente entendió que los factores siguientes eran importantes:

1. La escalera llegaba *únicamente* al apartamento del acusado y, por ende, no servía de entrada común a otros apartamentos en el edificio.

2. El área de entrada al apartamento del acusado estaba dentro de su *curtilage*.

3. El acusado tiene derecho a esconder objetos debajo de su felpudo (llaves, etc.). De hecho, quedó probado que el agente pudo observar las drogas sólo cuando

Otros tribunales han rechazado el concepto de *curtilage* para determinar el alcance de las protecciones de la Cuarta Enmienda. Véase, por ejemplo, *United States v. Fluker*, 543 F.2d 709, 716 (9no Cir. 1976). Allí, el tribunal utilizó un nuevo criterio para sustituir al del *curtilage* y, citando a *Wattenburg v. United States*, 388 F.2d 853 (9no Cir. 1968), expresó que:

> "[I]t seems to us a more appropriate test in determining if a search and seizure adjacent to a house is constitutionally forbidden is whether it constitutes an intrusion upon what the resident seeks to preserve as private *even in an area which, although adjacent to his home, is accesible to the public.* (Énfasis suplido.) *United States v. Fluker*, supra, pág. 716.([14])

■ B. En Puerto Rico hemos adoptado el criterio de la expectativa razonable de intimidad para analizar los reclamos de violaciones a la protección constitucional contra registros y allanamientos irrazonables.([15]) Lo crucial es determinar " 'si la persona tiene un derecho razonable a abrigar, donde sea, dentro de las circunstancias del caso específico, la expectativa de que su intimidad se respete' ". *E.L.A. v. P.R. Tel. Co.*, 114 D.P.R. 394, 402 (1983).

Recientemente hemos tenido la oportunidad de expresarnos sobre ese criterio. Así, en *Pueblo v. Rivera Colón*, supra, págs. 684–685, establecimos que para definir qué constituye una razonable expectativa de intimidad debe-

---

levantó el felpudo.

4. Aunque el mero hecho de que el objeto se encuentre en el *curtilage* no impide que un policía pueda legítimamente observarlo, los narcóticos no estaban "a plena vista". *People v. Shorty*, supra, págs. 683–685.

([14]) No obstante, el tribunal consideró determinante el hecho de que la estructura tenía el acceso controlado, las puertas de acceso estaban siempre cerradas con pestillo y la estructura contenía sólo dos (2) apartamentos. A base de ello, el tribunal resolvió que el acusado tenía una expectativa razonable de intimidad mayor que la que tendrían los residentes de estructuras más grandes.

([15]) Para un historial del criterio de expectativa razonable de intimidad en Puerto Rico, véase *Pueblo v. Conde Pratts*, 115 D.P.R. 307, 333–335 (1984), opinión disidente del Juez Asociado Señor Negrón García; Chiesa, *op. cit.*, Sec. 6.9, págs. 348–349.

mos considerar los siete (7) factores siguientes, ninguno de los cuales es determinante:

1. El lugar registrado o allanado.
2. La naturaleza y grado de intrusión de la intervención policíaca.
3. El objetivo o propósito de la intervención.
4. Si la conducta de la persona indicaba una expectativa subjetiva de intimidad.
5. La existencia de barreras físicas que restrinjan la entrada o la visibilidad al lugar registrado.
6. La cantidad de personas que tienen acceso legítimo al lugar registrado.
7. Las inhibiciones sociales que se relacionen con el lugar registrado. Véanse, también: *Pueblo v. Ríos Colón*, 129 D.P.R. 71, 88 (1991); *Pueblo v. López López*, 129 D.P.R. 287, 291 (1991).

También dijimos que en Puerto Rico la protección contra registros y allanamientos irrazonables se extiende más allá del interior de la residencia e incluye la inmediación contigua a la residencia conocida jurídicamente como *curtilage*. *Pueblo v. Rivera Colón*, supra, pág. 683 y casos allí citados. Citamos los cuatro (4) factores expuestos en *United States v. Dunn*, supra, para determinar la extensión del *curtilage*:

> ...1) la proximidad de la casa a la zona que se alega compone el *curtilage*. Si la zona está muy próxima a la casa o residencia, este hecho por sí sólo hace mucho más probable que el área sea considerada como *curtilage*; 2) si el área se encuentra dentro de los linderos de la casa; 3) la naturaleza y el uso que se le da a esa zona, y 4) las medidas que haya tomado el residente para proteger esta zona de observaciones que puedan hacer los transeúntes que por allí pasan. (Énfasis suprimido.) *Pueblo v. Rivera Colón*, supra, pág. 684.

La Policía puede penetrar dentro del *curtilage* de una residencia que esté implícitamente abierta al público, mas ello ha de hacerse con el propósito de conversar con los

ocupantes de la residencia o preguntar por alguna persona. *Pueblo v. Torres Resto*, 102 D.P.R. 532, 534 (1974). Ahora bien, el hecho de si el registro se efectuó dentro o fuera del *curtilage* es una determinación de umbral. Luego habría que analizar si la actuación gubernamental dentro del *curtilage* violó la expectativa razonable de intimidad de la persona.

C. En su "Moción conteniendo argumento adicional a la supresión de evidencia", los apelantes sostienen que la actuación investigativa del agente Galarza dentro del edificio residencial violó su expectativa de intimidad. Se fundan en lo resuelto en *Pueblo v. Pérez Pérez*, 115 D.P.R. 827 (1984).([16])

Los hechos de *Pueblo v. Pérez Pérez*, supra, son los siguientes. Tras recibir una confidencia anónima a los efectos de que en un apartamento de un condominio privado se traficaba drogas, se ordenó a un agente a que montara vigilancia. El agente se dirigió a dicho condominio y, burlando las cercas que rodean al edificio, los portones eléctricos y el guardia de seguridad, logró acceso a éste. Su entrada a las torres, que poseen puertas que siempre se mantienen cerradas, fue también clandestina. Una vez estableció su vigilancia en el pasillo del octavo piso, el agente observó que cierto número de personas llegaban hasta la puerta del apartamento investigado, entregaban dinero y recibían sobres y bolsas. Días después el agente observó una serie de transacciones similares en el garaje del edificio, al cual penetró otra vez sin autorización.

Luego de varios días el agente prestó una declaración jurada, la cual sirvió de base para expedir la orden de allanamiento. Éste se realizó y se ocupó evidencia delictiva. La defensa solicitó la supresión de la evidencia ocupada, lo cual fue denegado.

---

([16]) Opinión emitida por el Juez Presidente Señor Trías Monge. El Juez Asociado Señor Rebollo López emitió un voto disidente, reservándose el derecho de emitir una opinión a esos efectos.

En aquella ocasión revocamos. Al extender la protección del Art. II, Sec. 10 de nuestra Constitución, *supra*, a las áreas comunes de las estructuras multipisos,([17]) dijimos:

> No hallamos base para sostener que en este país de mucha gente y poca tierra aquellos que resuelvan vivir en condominios no tienen derecho razonable a abrigar que su intimidad se respete a un grado comparable al de los habitantes de residencias tradicionales. Un condómino espera que por los pasillos y otras áreas comunes de su edificio transiten únicamente otros condueños y personas invitadas. En casos como el presente los condueños tienen derecho a confiar que no pululen por las zonas protegidas invasores e intrusos. Los pasillos de los condominios no son calles de la ciudad, ni su garage es menos privado que el de otro tipo de hogar. *Pueblo v. Pérez Pérez*, supra, pág. 830.

Entendimos que en ese caso se le había violado al residente su expectativa razonable de intimidad. No existían circunstancias de emergencia, por lo que la policía necesitaba una orden judicial para poder entrar inicialmente a las áreas comunes de la propiedad. *Pueblo v. Pérez Pérez*, supra, pág. 831.

Al distinguir los hechos de *Pueblo v. Pérez Pérez*, supra, de los del presente caso, el juez de instancia rechazó el planteamiento de expectativa razonable de intimidad de los coacusados. Fundó su resolución esencialmente en que el condominio de vivienda en *Pueblo v. Pérez Pérez*, supra, era privado y tenía el acceso controlado, mientras que en el caso de autos el apartamento de los coacusados se ubica en un residencial público. Tras una extensa descripción del carácter público del complejo de vivienda de los apelantes, el tribunal concluyó que

> [o]bviamente, por la forma en que se desarrollan los caseríos públicos en Puerto Rico, la expectativa razonable de privacidad que puedan tener sus residentes es considerablemente menor al que tiene una persona que vive en una urbanización de casas

---

([17]) Expresamos que el vestíbulo de los condominios podría "presentar una situación especial en ciertas circunstancias". *Pueblo v. Pérez Pérez*, 115 D.P.R. 827, 830 esc. 1 (1984).

individuales de residencias tradicionales y de un condominio privado en las circunstancias de los condominios del caso de Pérez Pérez, supra. Resolución de 21 de octubre de 1987, pág. 16.

No podemos estar de acuerdo con esa interpretación.

■ Aquella porción de los pasillos en condominios o edificios de vivienda múltiple que conduce a la entrada de apartamentos y, en especial, el área inmediatamente fuera de la puerta de entrada a un apartamento, es parte del *curtilage* de la vivienda próxima a éste. Nos parece razonable concluir que a dicha área se "extiende la actividad íntima asociada con la santidad del hogar". E.L. Chiesa, *Derecho procesal penal de Puerto Rico y de Estados Unidos*, Colombia, Ed. Forum, 1991, Vol. I, Sec. 6.16, pág. 432. Su proximidad al apartamento de vivienda "por sí sólo hace mucho más probable que el área sea considerada como *curtilage*". *Pueblo v. Rivera Colón*, supra, pág. 683; *United States v. Dunn*, supra, pág. 301.

■ Sin embargo, como dijéramos en *Pueblo v. Rivera Colón*, supra, a la determinación inicial de si la zona en cuestión está dentro del *curtilage* no resuelve el problema de si hubo un allanamiento en violación a nuestra Carta de Derechos. Para ello es necesario evaluar si la intervención policíaca violó la expectaiva razonable de intimidad de la persona y no meramente si hubo una entrada ilegal. *Pueblo v. Rivera Colón*, supra, pág. 683. Si aplicamos los siete (7) factores —que fueron introducidos en *Pueblo v. Rivera Colón*, supra, y reafirmados en *Pueblo v. López López*, supra, y en *Pueblo v. Ríos Colón*, supra— que los tribunales han de utilizar para determinar qué constituye una expectativa razonable de intimidad, resulta claro que la actuación del agente Galarza constituyó un registro irrazonable bajo el Art. II, Sec. 10 de nuestra Constitución, *supra*.

■ Primeramente, ya hemos dicho que el área desde donde el agente escuchó las conversaciones incriminatorias

está íntimamente relacionada con la vida privada de los apelantes. En segundo lugar, la actuación del agente Galarza constituyó una intrusión irrazonable en la vida íntima de los apelantes. No podemos condonar el hecho de que los agentes del orden público se acerquen a las puertas de las residencias para escuchar las conversaciones que se efectúen tras puertas cerradas.([18]) En *Pueblo v. Rivera Colón*, supra, pág. 686, citando a *Pueblo v. Torres Resto*, supra, dijimos que la Policía puede entrar en áreas del *curtilage* que estén implícitamente abiertas al público, *con el propósito de conversar con los ocupantes de la residencia o procurar a alguna persona*. Se ha aceptado para fines de argumentación que el agente Galarza se acercó a la puerta de los coacusados con el propósito inicial de corroborar la confidencia respecto al número del apartamento, sin embargo, lo cierto es que después lo hizo *con el propósito de escuchar lo que se conversaba adentro.*

En tercer lugar, entendemos que los acusados, al mantener su puerta cerrada durante las intervenciones del agente, ejercieron una conducta razonable que indicaba una expectativa razonable de intimidad. "La puerta cerrada es la afirmación por excelencia del derecho individual a estar protegido en la intimidad." *Pueblo v. Ríos Colón*, supra, pág. 89. Además, no hay prueba en el registro a los efectos de que los coacusados estuvieran hablando en voz excesivamente alta, de manera que renunciaran a su expectativa subjetiva de intimidad.

Por último, nuestra sociedad no está dispuesta a tolerar el grado de intrusión, que aquí ocurrió, a la intimidad de los apelantes en su hogar. Entendemos que el apostarse

---

([18]) El Procurador General señala que la primera vez que el agente Galarza se acercó a la puerta lo hizo con el propósito de verificar que el número de apartamento era el mismo que el indicado en la confidencia. Sin embargo, el agente no tenía que pararse frente a la puerta de los coacusados, toda vez que el número era visible desde los últimos escalones de la escalera que llega al piso de los coacusados. Véase el *Exhibit* 2 de la defensa. Posteriormente, el propio agente afirmó que la segunda vez que se acercó a la puerta fue para escuchar lo que se conversaba adentro.

cerca de la puerta de una residencia con el propósito de escuchar lo que adentro se dice, independientemente del derecho de tal persona a estar en el área circundante a ésta, constituye un atentado intolerable a los valores personales y sociales que protege nuestra Constitución. Ello es así sin importar qué tipo de residencia esté involucrada. Rehusamos limitar las protecciones consagradas en *Pueblo v. Pérez Pérez*, supra, a los pasillos y a las áreas comunes de condominios privados o de acceso controlado. No podemos negárselas a los ciudadanos que viven en los residenciales públicos de Puerto Rico.

Más aún, entendemos que resulta irrelevante si el complejo de viviendas tiene el acceso controlado (portones eléctricos, guardias de seguridad, cercas, puertas cerradas con llave) para fines de determinar si existe una expectativa razonable de intimidad. El acceso a los complejos de viviendas se limita, no con el propósito exclusivo de aumentar la intimidad de los que viven allí, sino principalmente para incrementar la seguridad de sus residentes ante el avance del crimen. Resultaría incorrecto, entonces, utilizar ese factor como determinante para medir la expectativa de intimidad de los residentes.

Tampoco debemos concluir que, una vez un ciudadano hace o dice algo al alcance de la vista u oído de otra persona, no hace diferencia el que esa persona sea su vecino o un policía:

> To [the common citizen] it seems intuitively evident that anything a person does within sight or hearing of his neighbors or the general public is not private —and that, as to such things, it makes no difference whether they are observed by a neighbor or a policeman— because we retire to our homes when we want real privacy. *But if you live in a cheap hotel or in a ghetto flat, your neighbors can hear you breathing quietly even in temperate weather when it is possible to keep the windows and the doors closed. For the tenement dweller, the difference between observation by the neighbors and the visitors who ordinarily use the common hallways and observation by policemen who come into the hallways to "check up" or "look around" is the difference*

*between all the privacy that his condition allows and none.* (Énfasis suplido.) A.G. Amsterdam, *Perspectives on the Fourth Amendment*, 58 Minn. L. Rev. 349, 404 (1974).

En resumen, hoy hacemos uso una vez más de nuestra facultad para interpretar más ampliamente, de acuerdo con el Art. II, Sec. 10 de nuestra Constitución, *supra*, las protecciones contra registros y allanamientos irrazonables. Resolvemos que dichas protecciones se extienden a los pasillos y a otras áreas comunes de estructuras de viviendas múltiples, sin hacer distinciones entre condominios privados con acceso limitado y residenciales públicos.[19] Nuestra Carta de Derechos brinda una misma protección contra intrusiones irrazonables por parte del Gobierno, ya seamos ricos o pobres, inocentes o culpables.[20]

---

[19] Hoy cobran vigencia una vez más las palabras del entonces Juez Asociado Señor Serrano Geyls:

"Sabemos que el juego ilegal de la 'bolita' causa graves males sociales y económicos en Puerto Rico. Por su conducto se escurren grandes sumas de dinero que pertenecen en su casi totalidad a los grupos económicamente débiles; ha facilitado la creación y consolidación de organizaciones criminales profesionales que de esa actividad saltan a otras socialmente más peligrosas, y que constituyen un elemento erosivo aún para la propia fuerza pública ...; la continuada presencia de ese juego ilegal en nuestro medio es un reto perenne al régimen de derecho imperante en el país y al respeto que la ciudadanía debe a los funcionarios encargados del orden público. También sabemos que dicho delito, al igual que otros que comprenden la manipulación y posesión de objetos pequeños, es de muy difícil erradicación, y que desde hace tiempo el estado realiza considerables esfuerzos para combatirlo.

"Esas duras realidades sociales no pueden, sin embargo, causar el relajamiento de las normas constitucionales que limitan los procedimientos de investigación y acusación criminal. Ellas son un mínimo de garantías que toda sociedad verdaderamente civilizada se da a sí misma en ánimo de conducir los procedimientos de manera responsable y equitativa, y en el entendido que la justicia humana es esencialmente falible y que urge, por tanto, rodearla de protecciones procesales que atenúen su falibilidad. El relajamiento y la desatención de esas garantías mínimas es un precio demasiado alto a pagar por una mayor eficiencia policíaca." (Escolios omitidos.) *Pueblo v. Luciano Arroyo*, 83 D.P.R. 573, 585–586 (1961).

[20] A estos últimos efectos, véase *McDonald v. United States*, 335 U.S. 451, 453 (1948): "This guarantee of protection against unreasonable searches and seizures extends to the innocent and guilty alike. It makes the right of privacy as one of the unique values of our civilization."

## IV

Resuelto el hecho de que la actuación del agente Galarza, al escuchar conversaciones desde la puerta de la residencia de los apelantes en dos (2) ocasiones, violó los derechos constitucionales de los acusados, debemos determinar si, en ausencia de ello, aún existía causa probable suficiente para la expedición de la orden de allanamiento. Los apelantes sostienen que la declaración jurada que sirvió de base para expedir la orden de allanamiento es insuficiente. No tienen razón.

La declaración jurada que prestó el agente Galarza y que dio base a la expedición de la orden de allanamiento expone lo siguiente:

> Que soy agente investigador, adscrito a la Div. Control Vicios de la Policía de P.R. área de Ponce. Que se me asignó investigar confidencialmente en el sentido de que en un apartamento ubicado en el bloque #29 del res. Dr. Pila de Ponce se está recogiendo y cuadrando material de la bolita. La información llega mediante llamada telefónica y dice el informante que el dueño del apartamento, de nombre Isidoro Montes, que éste tiene un Oldsmobile del 1986, color amarillo y negro, con tablilla ABH–176, se dedica a cuadrar bolita todos los martes y los sábados en su apartamento, ubicado en el bloque #29, apartamento 448 de Dr. Pila. Además informa que un individuo que tiene un auto Malibú, color brown [sic] de 1974, que la tablilla termina en [873], es quién busca el material en distintos lugares y lo trae al apartamento.
>
> Dicho apartamento se describe de la siguiente manera: apartamento ubicado en el bloque núm. 29 con el núm. 448 del res. Dr. Pila de Ponce, P.R. Que este bloque está pintado de color crema y rosa, que dicho apartamento está ubicado en el tercer piso de dicho bloque, en una esquina, que el mismo tiene la puerta de entrada pintada color rojo y un portón de rejas ornamentales, pintado color blanco con un candado, que por la parte de atrás tiene un balcón y una puerta pintada color rojo con dos ventanas tipo miami [sic]. Que mirando el bloque de frente, por el lado derecho tiene el bloque núm. 31, por el lado izquierdo tiene la carr. núm. 14, por la parte de atrás tiene la calle que cruza por el centro del residencial y de frente tiene el bloque núm. 30.
>
> Que el día martes, 25 de febrero de 1986, me personé al re-

sidencial Dr. Pila de Ponce, a las 7:30 P.M. a corroborar la información recibida, que pude observar dicho bloque y apartamento y el auto Oldsmobile de 1986, tablilla ABH-176, que me ubiqué en un lugar estratégico a dar vigilancia. Que a eso de las 8:30 P.M. llegó un auto Malibú color brown [sic] de 1974, tablilla 54X873, se estacionó frente al bloque núm. 29 y del mismo se bajó un individuo trigueño, de 28 años aprox., bajito, observé que este individuo tenía en sus manos una bolsa de papel estraza, caminó hasta comenzar a subir escaleras, yo caminé después de él y comencé a subir las escaleras del blq. núm. 30 que queda de frente, me detuve en el segundo piso y pude observar que éste llegó hasta el apartamento núm. 448, donde tocó en la puerta, inmediatamente una mujer de unos 25 años aprox., blanca de pelo lacio cerró el portón y la puerta. Luego yo llegué hasta la puerta, me acerqué a la misma y pude escuchar cuando una voz de hombre decía y una voz de mujer le contestaba con 5 y el hombre decía 326 y la mujer contestaba 10 y así seguían correlativamente. Luego de escuchar esto procedí a retirarme del lugar, pero ubicándome en un lugar estratégico. Pasados unos 35 minutos el individuo antes mencionado salió del apartamento, abordó el auto Malibú y se retiró del lugar.

A eso de las 9:30 P.M. llegó nuevamente y se estacionó en el mismo lugar, al desmontarse, observé que llevaba en sus manos un sobre de papel manila pequeño, doblado, inmediatamente comenzó a subir las escaleras y la misma mujer le abrió la puerta y el portón luego de éste tocar, esto lo pude observar porque yo me dirigí caminando por el otro lado del bloque cuando el individuo caminaba. Luego de esto me mantuve cerca del área. A eso de la 10:30 P.M. llegó y se estacionó un auto Toyota, aprox. de 1983, color gris, tablilla 79A701 del mismo se bajó un individuo blanco y pude observar que penetró al apartamento, pasados unos 10 minutos salió, abordó el auto y se retiró.

Que decidí cambiar de auto, me dirigí hasta la oficina y dejé el au[t]o y abordé otro, me dirigí al lugar a eso de las 11:30 P.M., observé que el apartamento tenía las luces encendidas y la puerta del balcón abierta. A eso de las 12:15 A.M. llegó y se estacionó cerca del bloque un Jeep, color amarillo con capota en tela, color negro, tablilla OZB-337, el individuo que lo conducía tocó bocina en varias ocasiones y pude observar que por el balcón del apartamento 448 salió un individuo y le hizo una señal de que esperara. Inmediatamente bajó del apartamento y llegó hasta el Jeep y el que lo conducía le entregó una bolsa de papel como las que usan en los supermercados y se la entregó al individuo que bajó. A la vez le dijo aquí está todo el material de Villalba, el individuo que bajó cogió el bolso e inmediatamente

se dirigió hacia el apartamento. El individuo que bajó del apartamento es el individuo del Malibú.

A las 12:30 A.M. me retiré del lugar sin tomar acción alguna, debido a que estaba investigando confidencialmente.

El sábado, 1ro. de marzo de 1986, me personé nuevamente al residencial Dr. Pila a continuar la investigación a eso de las 8:00 P.M., me ubiqué en un lugar estratégico y pude observar que el auto Malibú, tablilla 54X873, se encontraba estacionado cerca del bloque. Que me mantuve en el lugar y observé que el mismo individuo de la vez anterior se montó en el auto y se retiró del lugar, pasados unos 30 minutos regresó y al desmotarse del auto, observé que llevaba en sus manos un sobre de papel manila y lo observé hasta que llegó al apartamento 448 y penetró al mismo. Esperó unos 15 minutos y subí hasta la puerta del apartamento y pude escuchar que igual a la vez anterior, pero esta vez, ambos con voz de hombre, cantaban números correlativamente y otro indicaba la cantidad. Luego de esto me ubiqué cerca del bloque nuevamente y pude observar que personas entraban al apartamento, llevando paquetes en sus manos y saliendo sin ellos.

A eso de la 10:00 P.M. me retiré del lugar, convencido moralmente de que dicho apartamento, ubicado en el bloque núm. 29 apt. 448 del residencial Dr. Pila de Ponce, P.R. está siendo utilizado para recolectar, coleccionar, almacenar y cuadrar material y dinero relacionado con bancas clandestinas que operan en Puerto Rico el juego ilegal de la bolita y/o boli-pool.

Por lo antes expresado, muy respetuosamente solicito de este Hon. tribunal que si del modo declarado por mí, encuentra que existe causa probable de que en dicho apartamento se está violando la ley, se sirva a expedir una orden de allanamiento para registrar el mismo y sorprender allí a toda persona que se encuentre violando la ley y ocupar toda evidencia que se relacione con dichos juegos ilegales en violación a la Ley #220 del juego ilegal de la bolita y ocupar toda evidencia que se relacione con dichos juegos ilegales, tales como material de bolita, dinero y/o [sic] otro implemento que se utilicen en estos casos, y si fuesen ocupados los traeré a su presencia en la forma y modo que la Ley lo autoriza en estos casos. (Énfasis suprimido.) Informe del Procurador General, págs. 9–11.

▇▇  Surge de la declaración jurada transcrita que está fundamentada parcialmente en una confidencia hecha al agente Galarza por una persona cuya identidad se desconoce. Recientemente atendimos el asunto de la suficiencia de ese tipo de declaración jurada para sostener la

determinación de causa probable que se requiere para la expedición de una orden de registro o allanamiento. *Pueblo v. Muñoz, Colón y Ocasio*, 131 D.P.R. 965 (1992). Allí, al amparo de la Constitución federal, resolvimos que al evaluar la suficiencia de dichas declaraciones juradas deben considerarse los criterios que establecimos en *Pueblo v. Díaz Díaz*, 106 D.P.R. 348 (1977), para determinar la existencia de causa probable en el contexto de arrestos.([21]) Aclaramos que al aplicar dichos criterios "siempre hemos exigido que la confidencia haya sido corroborada por el agente, ya sea mediante observación personal o por información de otras fuentes". (Énfasis en el original.) *Pueblo v. Muñoz, Colón y Ocasio*, supra, pág. 983.([22]) Reiteramos que el análisis de la suficiencia de dichas declaraciones juradas también debe tomar en cuenta los criterios que hemos establecido respecto a los testimonios estereotipados. Ahora bien, al ejercer nuestra facultad revisora, no nos corresponde hacer una determinación *de novo* de causa probable: "[s]ólo nos corresponde estimar si la evidencia considerada en su totalidad proveía una base sustancial para la determinación de causa probable por el magistrado." *Pueblo v. Muñoz, Colón y Ocasio*, supra, pág. 984.

En el caso de autos, al igual que en *Pueblo v. Muñoz, Colón y Ocasio*, supra, pág. 991, "no estamos tratando con

---

([21]) Según *Pueblo v. Díaz Díaz*, 106 D.P.R. 348, 354 (1977), basta la concurrencia de una o más de las circunstancias siguientes:

"... 1) que el confidente previamente ha suministrado información correcta; 2) que la confidencia conduce al criminal en términos de lugar y tiempo; 3) que la confidencia ha sido corroborada por observaciones del agente, o por información proveniente de otras fuentes; y 4) que la corroboración se relaciona con actos delictivos cometidos, o en proceso de cometerse."

([22]) En *Pueblo v. Ortiz Alvarado*, 135 D.P.R. 41 (1994), reafirmamos lo decidido en *Pueblo v. Muñoz, Colón y Ocasio*, 131 D.P.R. 965 (1992). Añadimos, además, que con respecto a la corroboración:

"Lo importante es si el agente que efectúa el arresto y allanamiento sin orden judicial tiene, al momento de hacerlo, base razonable o motivos fundados para creer que se estaba violando o se iba a violar la ley; esto es, si se desprende, de la totalidad de las circunstancias, que una persona prudente y razonable creería que se ha cometido o se va a cometer la ofensa objeto de las confidencias." *Pueblo v. Ortiz Alvarado*, supra, pág. 47.

órdenes basadas únicamente en confidencias, sino fundamentadas en las observaciones de un agente". En vista de ello, concluimos que, aun excluyendo aquellos datos que el agente Galarza obtuvo en violación de los derechos constitucionales de los acusados, existía causa probable suficiente para expedir la orden de allanamiento. La confidencia que dio pie a la investigación fue corroborada mediante la observación directa del agente Galarza.(²³) Éste vio al poseedor del vehículo marca Malibú, quien fue identificado en la confidencia como la persona que recogía y llevaba el material de bolita al apartamento allanado, bajar de dicho apartamento y recoger una bolsa de papel; a la misma vez, escuchó que la persona a quien se la entregaba le decía: "Aquí está el material de Villalba." Momentos antes, el agente observó que el poseedor del Malibú había entrado al apartamento en cuestión con una bolsa de papel estraza. Luego, esta persona salió de nuevo en su auto y regresó al mismo apartamento con un sobre manila. Todo lo anterior ocurrió el martes por la noche y el miércoles de madrugada, día cuando tradicionalmente se juega la Lotería de Puerto Rico.(²⁴) Además, la confidencia condujo hacia el apartamento de los acusados y el agente corroboró, mediante observación, su número y bloque, así como el número de la tablilla, el modelo y el año de los vehículos que los acusados utilizaban.(²⁵) Considerado en su totalidad lo anterior, concluimos que existía un fundamento razonable o motivos fundados para creer que se estaba violando la ley. Siendo ello así, había causa probable suficiente para

---

(²³) Durante el juicio, el agente Galarza declaró, entre otras cosas, que ha investigado bancas de bolita; que investiga y corrobora confidencias; que ha efectuado numerosas investigaciones cuyos resultados han sido positivos. E.N.P., págs. 1 y 3, según enmendada.

(²⁴) Una vez más tomamos conocimiento judicial de la forma como se realiza el juego de la bolita. Véanse: *Pueblo v. Muñoz, Colón y Ocasio*, supra; *Pueblo v. González*, 86 D.P.R. 250, 251 (1962). Generalmente la bolita se juega de acuerdo con las últimas cifras de los primeros premios de la Lotería de Puerto Rico. *Íd.*

(²⁵) El agente también relató en la declaración jurada que el sábado siguiente pudo observar actos similares a los que había visto el martes y miércoles anteriores.

expedir la orden de allanamiento en el caso de autos.
Véanse: *Pueblo v. Ortiz Alvarado*, supra; *Pueblo v. Pagán, Ortiz*, 130 D.P.R. 470 (1992).

## V

Los apelantes sostienen también que la orden de alla-
namiento y la declaración jurada que dio lugar a su expe-
dición no cumplen con el requisito de especificidad. No tie-
nen razón.

Como se sabe, la Sec. 10 del Art. II de nuestra
Constitución, *supra*, y la Regla 231 de Procedimiento Cri-
minal, 34 L.P.R.A. Ap. II, exigen, entre otras cosas, que la
orden de registro y allanamiento describa con particulari-
dad las cosas o propiedades a ocuparse.[26] El propósito de
dicho requisito es "impedir el uso arbitrario de la discre-
ción por parte del agente que practica el registro o
incautación". O.E. Resumil de San Filippo, *Práctica jurí-
dica de Puerto Rico: derecho procesal penal*, New Hamps-
hire, Ed. Equity, 1990, T. I, pág. 294.

Si el propósito del registro y allanamiento es
ocupar artículos específicos, ellos han de describirse con
precisión en la orden, de manera que limite lo más posible
el alcance de la intervención gubernamental. Si, por el con-
trario, se busca ocupar cualquier propiedad no específica,
pero de determinado carácter que, por su naturaleza sea
ilegal, no es necesaria una descripción detallada de los ob-
jetos y bastará una caracterización general sobre su
naturaleza. *People v. Schmidt*, 473 P.2d 698 (Colo. 1970),
citado en LaFave, *op. cit.*, Sec. 4.6, Vol. 2, pág. 243.[27] Con-

---

[26] Igual requerimiento hace la Cuarta Enmienda de la Constitución federal, L.P.R.A., Tomo 1.

[27] El profesor LaFave señala en su tratado:
"[i]llustrative of the types of descriptions which have been upheld by the courts are the following: 'cases of whiskey' where prohibition is in effect; 'gambling para-phernalia', *any lottery, policy or pool tickets*; 'paraphernalia used in the manufacture

forme a ello, en Puerto Rico hemos permitido tal clase de descripción cuando lo que se pretende ocupar no es un objeto u objetos en particular, sino artículos de cierta clase o naturaleza. Así, no es nula una orden de allanamiento que disponga la incautación de " 'todo material relacionado con el juego ilegal de la bolita' ". *Pueblo v. Soto Zaragoza*, 99 D.P.R. 762, 767 (1971).([28])

Por otro lado, se ha reconocido que si la orden carece de especificidad, la declaración jurada en la cual se funda el mandato puede satisfacer dicha deficiencia si ésta se incorpora a la orden mediante referencia. Véase *Twenty-Second Annual Review of Criminal Procedure: United States Supreme Court and Court of Appeals 1991–1992*, 81 Geo. L.J. 853, 867 (1993). El concepto no es totalmente novedoso en Puerto Rico. Aunque en el contexto del *lugar* a registrarse, en *Pueblo v. Tribunal Superior*, 97 D.P.R. 517, 521–522 (1969), tomamos en consideración *"en conjunto* todo lo expresado en la declaración jurada y en la orden de allanamiento" —(énfasis suplido)— para pasar juicio sobre el requisito de particularidad de la orden impugnada.

En el caso de autos, la orden de allanamiento concluye de la manera siguiente:

"A eso de las 10:00 P.M. [el agente que prestó la declaración jurada] se retiró del lugar, convencido moralmente de que dicho apartamento, ubicado en el bloque núm. 29, apt. 448 del residencial Dr. Pila de Ponce, P.R. está siendo utilizado para recolectar, coleccionar, almacenar y cuadrar material y dinero relacionado con bancas clandestinas que operan en Puerto Rico el juego ilegal de la bolita y/o boli-pool.

Hallando este Hon. Juez que suscribe, que en la forma expresada por el declarante, encuentra que existe causa probable, de

---

of counterfeit federal reserve notes'; 'narcotic drugs'; 'marijuana, dangerous drugs, stimulant drugs, and hallucinogenics'; 'controlled substances'; and 'narcotics, dangerous drugs and narcotics paraphernalia'." (Escolios omitidos y énfasis suplido.) W.R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment*, 2da ed., Minnesota, Ed. West Publishing Co., 1987, Vol. 2, Sec. 4.6(c), pág. 243.

([28]) En esa ocasión los apelantes argumentaron que no era válido ordenar que se ocupase " 'todo lo relacionado con el juego ilegal de la bolita' ", sino únicamente aquello que fue objeto de la percepción del agente. *Pueblo v. Soto Zaragoza*, 99 D.P.R. 762, 767 (1971).

que en el referido apartamento, se está violando la ley, por lo tanto se ordena que durante las horas del día o de la noche, proceda inmediatamente al registro o allanamiento de dicho apartamento y sorprenda allí a toda persona que se encuentre violando la ley y ocupe toda evidencia que se relacione con la misma, los traiga a mi presencia en la forma que la Ley lo autoriza." Informe del Procurador General, pág. 14.

Aunque la parte dispositiva de la orden ciertamente no es un modelo de especificidad, su totalidad revela que la intención de este mandato judicial era que se ocupara todo el material relacionado con el juego ilegal de la bolita. El epígrafe de la orden dispone que ésta fue expedida "POR: INF. LEY 220 (BOLITA Y/O BOLI-POOL)". Además, el texto de dicha orden incorpora por referencia la declaración jurada que dio base para ésta. Tanto de esa declaración como de su incorporación a la orden de allanamiento, claramente se desprende que se investigaron hechos relacionados con violaciones a la ley que prohíbe el juego de la bolita y que la orden judicial de registro fue solicitada con el propósito de ocupar material y dinero producto de dicho juego. De la totalidad de la orden de allanamiento resulta obvia la autorización a ocupar el material típico que se utiliza para operar estas bancas clandestinas. Se desprende del documento judicial información suficiente como para limitar la discreción de los agentes que efectuaron el allanamiento a incautar dicha evidencia.[29] Aquí, como en *Pueblo v. Tribunal Superior*, supra, pág. 522, ello "[e]s la interpretación razonable".

## VI

Por último, la coapelante Meléndez Rodríguez sostiene que no se probó, más allá de duda razonable, que ostentaba la posesión y el dominio de las armas que se ocuparon du-

---

[29] Es importante señalar también que el Agente Juan R. Galarza, quien prestó la declaración jurada, participó tanto en la investigación como en el allanamiento del apartamento de los apelantes.

rante el allanamiento y que dieron lugar a las convicciones por infracciones a los Arts. 6 y 11 de la Ley de Armas de Puerto Rico, *supra*,([30]) y al Art. 168 del Código Penal, *supra*.([31]) Sostiene la coapelante que toda la prueba que la conecta con la comisión de dichos delitos consiste en su presencia en el apartamento mientras el agente prestaba vigilancia y cuando el apartamento fue allanado posteriormente.

Al enfrentarnos a tal tipo de ataque a una convicción, fundado en que no se estableció la culpabilidad más allá de *duda razonable*, hemos afirmado que tal concepto

> ... [n]o quiere decir que toda duda posible tenga que ser destruida y 'que la culpabilidad del acusado tenga que establecerse con certeza matemática, sino que la evidencia' establezca 'aquella certeza moral que convence, dirige la inteligencia y satisface la razón. Duda razonable es una fundada, producto del raciocinio de todos los elementos de juicio envueltos en el caso. (Citas omitidas.) *Pueblo v. Bigio Pastrana*, 116 D.P.R. 748, 761 (1985).

---

([30]) El Art. 6 de la Ley de Armas de Puerto Rico, Ley Núm. 17 de 19 de enero de 1951, según enmendada, dispone:

"Toda persona que tenga o posea cualquier pistola, revólver u otra arma de fuego sin tener una licencia para ello expedida como más adelante se dispone, será culpable de delito menos grave, y si ha sido convicta con anterioridad de cualquier infracción a este Capítulo o de cualquiera de los delitos especificados en la sec. 427 de este título, o usare el arma en la comisión de uno de dichos delitos, será culpable de delito grave." 25 L.P.R.A. sec. 416.

Por otro lado, el Art. 11 de la Ley de Armas de Puerto Rico dispone, en parte:
"Será culpable de delito grave toda persona que:

. . . . . . . . .

"(b) A sabiendas compre, venda, reciba, enajene, traspase, porte o tenga en su posesión, cualquier arma de fuego a la cual se le haya removido, mutilado, alterado o borrado el número de serie o el nombre de su poseedor ...." 25 L.P.R.A. sec. 421.

([31]) El Art. 168 del Código Penal dispone:

"Toda persona que compre, reciba, retenga, transporte, cargue o disponga de algún bien ueble, a sabiendas de que fue obtenido mediante apropación ilegal, robo, extorsión, o cualquier otra forma ilícita, será sancionado con pena de reclusión que no excederá de seis (6) meses o multa que no excederá de quinientos (500) dólares, o ambas penas a discreción del tribunal, si el valor del bien apropiado ilegalmente no llegare a doscientos (200) dólares. Si llegare o excediere este valor, será sancionada con pena de reclusión por un término fijo de tres (3) años. De mediar circunstancias agravantes, la pena fija establecida podrá ser aumentada hasta un máximo de cinco (5) años; de mediar circunstancias atenuantes, podrá ser reducida hasta un mínimo de dos (2) años. El tribunal podrá imponer la pena de restitución en adición a la pena de reclusión establecida o ambas penas." 33 L.P.R.A. sec. 4274.

A la luz del anterior principio hemos examinado la Exposición Narrativa de la Prueba en el caso de autos. Ésta revela que la prueba desfilada demostró, más allá de duda razonable, la culpabilidad de la coapelante Meléndez Rodríguez.

■■■ Ésta tiene razón cuando sostiene que la mera presencia de una persona durante la comisión de un delito no es suficiente, por sí sola, para sostener una convicción contra ella por tal delito. Así lo reiteramos recientemente en *Pueblo v. Pagán, Ortiz*, supra. También dijimos, no obstante, que ese

> ... hecho puede considerarse conjuntamente con otras circunstancias que rodean el hecho delictivo a los fines de fijar la responsabilidad criminal. No es indispensable, pues, que los acusados ejecuten personalmente el acto delictivo. Su presencia en el lugar de los hechos es indicio de su responsabilidad como coautores siempre que ésta pueda establecerse además de otros actos anteriores o como el resultado de una conspiración o de un designio común en que participaron. *Pueblo v. Aponte González*, 83 D.P.R. 511, 519–520 (1961); *Pueblo v. Ortiz Martínez*, 116 D.P.R. 139, 145–146 (1985). *Pueblo v. Pagán, Ortiz*, supra, págs. 478–479.

■■■ En este presente caso estamos frente a tres (3) delitos cuyo elemento esencial es la posesión ilegal de cierta clase de objetos (armas). La apelante se queja de que no se probó dicho elemento más allá de duda razonable. En cuanto a esta clase de delito hemos dicho que se puede imponer responsabilidad criminal, no sólo cuando el acusado tenga la posesión inmediata del objeto, sino también cuando el imputado ejerza una posesión constructiva sobre éste. *Pueblo en interés menor F.S.C.*, 128 D.P.R. 931 (1991). La posesión constructiva "se da cuando, a pesar de que una persona no tiene la posesión inmediata o tenencia física del objeto, tiene el poder e intención de ejercer el control o dominio sobre el mismo. ... En estos casos 'se impondrá responsabilidad penal a todas las personas que tengan co-

nocimiento, control y manejo del bien prohibido, aun cuando no lo tengan bajo su posesión inmediata'". Íd., pág. 940. La posesión directa y la constructiva, como cualquier otro tipo de elemento de un delito, se pueden probar con evidencia directa o circunstancial. Íd.

Conforme a los principios anteriormente descritos, no hay razón por la cual debamos modificar, en este caso, la apreciación de la prueba hecha por el foro de instancia. De entrada, aquí no se han planteado elementos de prejuicio, parcialidad o error que justifiquen nuestra intervención en el ejercicio de nuestra función revisora. *Pueblo v. Millán Meléndez*, 110 D.P.R. 171, 181 (1980).

Por otro lado, la prueba circunstancial desfilada en instancia es suficiente para sostener las convicciones más allá de duda razonable. Veamos.

Alega la coapelate que "[s]u presencia en el apartamento no constituye evidencia suficiente para establecer su culpabilidad más allá de duda razonable". Alegato de los apelantes, pág. 10. Sin embargo, la Exposición Narrativa de la Prueba revela que la evidencia en su contra no se limita sólo a su presencia en el apartamento. En primer lugar, las armas fueron ocupadas en el hogar de la coapelante Meléndez Rodríguez, quien compartía con su esposo, el coapelante Isidoro Montes Vega. Cuando los agentes iban a diligenciar la orden de allanamiento, el coacusado Ricardo Montes se disponía a salir del apartamento y, al notar la presencia de los policías, alertó al esposo de la coapelante sobre dicha presencia. E.N.P., págs. 3–4 y 6. El esposo entonces se asomó por la puerta a la vez que portaba un revólver. Íd. Dicho revólver fue ocupado en la residencia de la apelante y, con posterioridad, se determinó que era robado. E.N.P., págs. 4 y 6–7. El agente Arévalo ocupó el rifle calibre 22 cargado en uno de los cuartos del apartamento de la coapelante. E.N.P., págs. 4 y 6. Además, encontró la pistola niquelada con el número de serie mutilado en el cesto de ropa sucia (*hamper*) que se encontraba

en el baño del apartamento de la coapelante. E.N.P., págs. 4 y 6.

En resumen, la coapelante, en designio común con los Sres. Isidoro Montes y Ricardo Montes, participaba en la operación de la banca de bolita en su apartamento; las tres (3) armas se encontraban en dicho apartamento durante el transcurso de tal empresa delictiva; éstas fueron encontradas en distintos puntos de su residencia. Razonablemente podemos concluir, como aparentemente entendió el juzgador de los hechos, que las armas referidas se encontraban en dicho lugar para proteger el dinero y material delictivo que estaba en posesión de los apelantes y como parte de la empresa común a la cual se dedicaban. Por lo tanto, puede inferirse con claridad que dichas armas estaban también bajo el control y manejo de Meléndez Rodríguez, a pesar de que ella no ostentaba la tenencia física e inmediata de éstas. La prueba no nos produce insatisfacción alguna respecto a que la culpabilidad de la acusada fue probada más allá de duda razonable. Véanse: *Pueblo v. Somarriba García*, 131 D.P.R. 462 (1992); *Pueblo v. Carrasquillo Carrasquillo*, 102 D.P.R. 545, 551 (1974). Por tal razón no se cometió el error señalado.

## VII

Algunos de los hechos en los cuales descansó el magistrado para determinar causa probable a los fines de expedir la orden de allanamiento impugnada en este caso fueron obtenidos en violación a la expectativa razonable de intimidad de los apelantes. Sin embargo, al eliminar tales hechos de toda consideración posible, existían otros que proveían un fundamento suficiente para la determinación de causa probable que justificaba la expedición de la orden. Examinada en su totalidad, ésta también cumple con el requisito constitucional de especificidad. Por lo tanto, con-

cluimos que la orden de allanamiento impugnada es válida en derecho.

Por otro lado, la prueba desfilada en instancia nos satisface en cuanto a que la culpabilidad de la coapelante, por violación a los Art. 6 y 11 de la Ley de Armas de Puerto Rico, *supra*, y al Art. 168 del Código Penal, *supra*, fue establecida más allá de duda razonable.

Por las razones antes expuestas, *se dictará sentencia que confirme las convicciones apeladas.*

El Juez Asociado Señor Rebollo López concurrió con el resultado sin opinión escrita. El Juez Asociado Señor Hernández Denton está conforme con los pronunciamientos contenidos en la parte III de la opinión pero disintió del resultado sin opinión escrita por las razones expresadas en su disenso en *Pueblo v. Muñoz, Colón y Ocasio*, supra. El Juez Asociado Señor Negrón García se inhibió.