# 2006 DTA 18

**TRIBUNAL DE CIRCUITO DE APELACIONES**
**CIRCUITO REGIONAL DE BAYAMÓN**

EL PUEBLO DE PUERTO RICO
Apelado

EN INTERÉS DEL MENOR R. M. L.
Apelante

Núm. KLAN-2003-01357

San Juan, Puerto Rico, a 18 de noviembre de 2005

Panel integrado por su Presidente, el Juez Sánchez Martínez,
y las Juezas Cotto Vives y Fraticelli Torres

Fraticelli Torres, Jueza Ponente

MAR 1 4 2006

## TEXTO COMPLETO DE LA SENTENCIA

Al menor apelante R.M.L. se le declaró incurso por faltas al Artículo 5.04 de la Ley de Armas de Puerto Rico (portación y uso sin licencia de un arma de fuego; portación de arma neumática para cometer delito), Ley 404 de 11 de septiembre de 2000, según enmendada, 25 L.P.R.A. sec. 458c; y al Artículo 95 del Código Penal de Puerto Rico de 1974 (agresión agravada por inferir grave daño corporal y usar un arma mortífera de manera intencional), 33 L.P.R.A. sec. 4032. ■ El Tribunal de Primera Instancia, Sala Superior de Bayamón, Asuntos de Menores, le impuso la medida dispositiva de 18 meses en libertad a prueba por cada una de las faltas, los que cumpliría de forma concurrente bajo la custodia de su madre. El tribunal condicionó ambas medidas a que el menor continuara estudios o trabajara y a que regresara a su hogar diariamente en o antes de las 7:30 p.m.

El menor R.M.L. nos solicita que revoquemos la resolución del foro de primera instancia por la comisión de los siguientes errores: (1) declararlo "*incurso en la falta por agresión agravada[,] a pesar de no surgir de la prueba desfilada evidencia de intención específica para cometer la alegada agresión*"; y (2) declararlo "*incurso en la falta por portación de un arma[,] a pesar de que la querella no imputa la comisión de una falta*".

## I

Los hechos que dieron lugar a las faltas imputadas al menor apelante, R.M.L., ocurrieron el 10 de diciembre de 2002, aproximadamente a la 1:00 p.m. en las cercanías de los predios de la Escuela Intermedia María Libertad Gómez en Toa Baja, Puerto Rico. R.M.L. se encontraba en el patio de su residencia hablando por un teléfono inalámbrico que sostenía con su mano derecha. Con su mano izquierda, sujetaba un rifle neumático de perdigones (*pellets*) que tenía recostado de la verja. (E.E.P., a la pág. 2.) En ese momento, el joven Jaime Matos Pérez (Matos Pérez) pasaba por el frente de la residencia de R.M.L. Al ver a Matos Pérez (con quien no tenía rencillas previas y quien no le dio motivo alguno para agredirlo), R.M.L. levantó el rifle de perdigones (*pellets*), éste se disparó y uno de los proyectiles impactó a Matos Pérez en la cabeza. El joven cayó al piso ensangrentado. Asustado por lo que había ocurrido, R.M.L. llevó a Matos Pérez al interior de la casa para tratar de curarlo, mientras le rogaba que no lo denunciara. Luego, Matos Pérez llamó a un amigo que pasaba por el lugar y con su ayuda se fue a la escuela a buscar a la guardia de seguridad para contarle lo acontecido y recibir asistencia médica. (E.E.P., a las págs. 1-3.)

El Procurador de Menores presentó tres querellas contra R.M.L., las dos que describimos y otra por violar el Artículo 130 (restricción a la libertad agravada) del Código Penal de 1974. El Tribunal de Primera Instancia determinó causa por las faltas al Artículo 95 del Código Penal y al Artículo 5.04 de la Ley de Armas. Sin embargo, no encontró causa por la falta al Artículo 130, toda vez que no hubo intención criminal ni R.M.L. usó violencia o intimidación para llevar al perjudicado a la casa con el propósito de curarlo. (Autos originales, Querellas, a los folios 2-11; Recurso de Apelación, a la pág. 2.) El tribunal señaló la vista adjudicativa para el 4 de agosto de 2003, pero, en esa ocasión, desestimó las querellas por razón de que se había violado el derecho del menor a un proceso rápido. (Apéndice del recurso, a la pág. 3; Autos originales, al folio 34.)

Posteriormente, el Procurador volvió a someter las dos querellas procedentes y anunció cinco testigos de cargo: Jaime Matos Pérez, la víctima; su amigo, Yamil López Pérez; la madre de Jaime, María Pérez Alfonso; el Dr. Oscar Abriles, que intervino quirúrgicamente a Jaime; y la guardia del plantel escolar, la agente Adamaritza Serrano Rodríguez. (Apéndice del recurso, a las págs. 4 y 5; Autos originales, a los folios 35-36.) Previo a la vista adjudicativa, celebrada el 23 de septiembre de 2003, el Procurador anunció dos nuevos testigos de cargo: la patóloga Cristina Gómez de Neris y la experta en balística Carmen Suliveres.

La defensa del menor R.M.L. objetó el uso de estos dos testigos adicionales, toda vez que no se anunciaron en la querella. Solicitó tiempo adicional para prepararse con relación a su testimonio. La defensa también alegó que el Procurador no había descubierto prueba esencial para la defensa del menor. (Autos originales, a los folios 42-45.) El foro primario denegó ambas solicitudes y celebró la vista adjudicativa. (Autos originales, a los folios 46-56.)

La prueba de cargo definitiva consistió en los testimonios de Jaime Matos Pérez, Yamil López Pérez, el Dr. Oscar Abriles, la agente Adamaritza Serrano Rodríguez y la experta en balística Carmen Suliveres.

En su testimonio, Matos Pérez alegó que, a pesar de que R.M.L y él no estudiaban en la misma escuela, se conocían de vista. Según dijo, antes de los hechos, *nunca hubo problema alguno entre ellos ni diferencias ni peleas ni agresiones verbales ni amenazas. El día de los hechos, R.M.L. tampoco le dijo que iba a dispararle.* Matos Pérez contó, además, que cuando R.M.L. terminó de hablar por teléfono, y a una distancia de 12 a 15 pies, levantó el rifle a la altura del pecho y le disparó; que *él le pidió que no le disparara*; que por el impacto que recibió en su cabeza, cayó al piso, *y despertó cuando sintió agua fría en su cabeza.* En ese momento fue que se percató de que estaba en la casa de R.M.L., *quien trató de curarlo.* (Énfasis nuestro. E.E.P., a las págs. 1 y 2.)

Mientras eso ocurría, vio que su amigo Yamil López Pérez pasaba cerca de la casa de R.M.L. y lo llamó para que le ayudara a salir. López Pérez entró a los predios de la casa, le abrió la puerta a Matos Pérez y lo ayudó a salir. Luego, Matos Pérez fue a la escuela intermedia aledaña a la casa de R.M.L. y contó lo ocurrido a la guardia del plantel, Adamaritza Serrano Rodríguez (agente Serrano). De allí, lo llevaron a la oficina de la secretaria para curarlo y llamaron a su mamá. Después lo llevaron al Hospital San Pablo y una pediatra lo atendió, le aplicó antibiótico y algo para el dolor. Posteriormente, el 18 de diciembre de 2002, un cirujano lo intervino de manera ambulatoria para extraerle el balín que tenía incrustado en su cuero cabelludo. Matos Pérez no sufrió daños en sus sistemas nervioso ni motor; tampoco en su apariencia física. (E.E.P., a la pág. 2.)

En el contrainterrogatorio, Matos Pérez declaró que R.M.L. *no colocó el rifle en la verja al verlo pasar, tampoco estaba apuntando por la mirilla a nadie y mantuvo el rifle a la altura de su pecho. Añadió que R.M.L. no bombeó (sic) el rifle para disparar y que en el momento en que surgió el disparo, R.M.L. no pronunció palabra alguna.* Dijo más, señaló *"que no hubo ningún tipo de comunicación entre ellos antes de ocurrir los hechos"*, a pesar de que en el directo dijo que le pidió que no le disparara en tres ocasiones. Matos Pérez contó que no gritó ni corrió ni pidió ayuda, ni cruzó al otro lado del camino *porque no había razón para pensar que R.M.L. le iba a disr̶      ̶ ̶* (Énfasis nuestro. E.E.P., a la pág. 2.)

Yamil López Pérez narró que escuchó a Matos Pérez decir *"no me dispares, no me dispares"* y luego escuchó un *puff* como de pistola *gotcha* o de *pellets*. Vio a Matos Pérez tocarse la cabeza y que tenía mucha sangre en su mano, en el cuello y la camisa. Además, vio a Matos Pérez caer al piso. Cuando acudió a socorrerlo, R.M.L. salió sorprendido y azorado de su casa. De acuerdo al testimonio de López Pérez, R.M.L. le pidió a Matos Pérez *"no digas nada, no digas nada"* y Matos Pérez le dijo *"se lo voy a decir a la guardia pa´ que te meta preso"*. (E.E.P., a la pág. 3.)

Narró López Pérez que R.M.L. agarró a Matos Pérez por un brazo y lo haló hacia su casa, a pesar de que Matos Pérez le pidió que no lo llevara. Declaró, además, que Matos Pérez le pidió a R.M.L. que lo dejara salir de la casa y que éste le ofreció dinero para que no dijera nada, que lo iba a curar. En esos momentos, contó López Pérez que fue en socorro de su amigo, nuevamente, para ayudarlo a salir de la casa y, entonces, vio a R. M.L. salir al patio y recoger un rifle de la grama que luego trató de romper y al no lograrlo lo lanzó a un pastizal de una cancha cercana. Luego, López Pérez declaró que se fue para los *bleechers* y observó a Matos Pérez con una guardia que cargaba el rifle. (E.E.P., a la pág. 3.)

En el contrainterrogatorio, *el testigo confesó que Matos Pérez le refrescó la memoria antes de la vista*, la cual ocurrió 9 meses después del incidente. (Énfasis nuestro. E.E.P., a la pág. 3.) También confesó que no vio a R.M.L. con el rifle en sus manos cuando su amigo Matos Pérez resultó herido. Dijo, además, que R.M.L. *salió del patio de su casa hacia el área donde estaba Matos Pérez para ver lo sucedido y para ayudarlo*. Incluso, *dijo que no pensó que R.M.L. fue el que le disparó a su amigo*. Declaró, además, que *desde fuera de la casa escuchó a R.M.L. decirle a su amigo que quería curarlo y ayudarlo*. (Énfasis nuestro. E.E.P., a la pág. 4.) Declaró que *"Jaime estuvo consciente y alerta todo el tiempo, que estaba hablando y nunca estuvo sin conocimiento"*. Además, que *"Jaime entró con R.M.L. a su casa voluntariamente"*. Estas manifestaciones contradicen lo dicho por él en el directo y la declaración del perjudicado de que entró sin conocimiento a la casa y despertó *"cuando sintió agua fría"*.

La agente Serrano narró los hechos de acuerdo a lo que le contó Matos Pérez. Ella no estaba en el lugar de los hechos. En esencia, *el joven le contó* que pasaba por un camino detrás de la escuela, que vio a R.M.L. con un rifle en sus manos, que le dijo tres veces que no le disparara, que R.M.L. le disparó y luego Matos Pérez se desbalanceó. También le contó que R.M.L. lo recogió y lo llevó a su casa para curarlo. Específicamente, lo llevó al baño, buscó gasas y le dijo que iba a curarlo. La agente Serrano dijo, además, que *vio el rifle en el zafacón que estaba en la cancha* cercana a la casa de R.M.L., lo ocupó y lo mostró a Matos Pérez. Éste lo identificó como el rifle que tenía R.M.L. Luego, llevó el rifle al cuartel de la policía y lo dejó bajo custodia. (E. P.P., a la pág. 4.) Esta versión es distinta a la ofrecida por el testigo López Pérez, quien dijo que R.M.L. tiró el rifle a un pastizal.

En el contrainterrogatorio, la agente Serrano dijo que Matos Pérez le contó que R.M.L. no estaba disparando el rifle cuando él pasaba cerca del lugar del incidente, que el rifle estaba recostado de la verja, que él caminaba a paso normal, que R.M.L. no le dijo que se detuviera, que R.M.L. no le hizo expresión o manifestación alguna, que no lo amenazó ni le dijo que iba a dispararle ni hubo ninguna comunicación entre ellos. La agente Serrano dijo, además, que *Matos Pérez le contó que R.M.L. no se detuvo para apuntarle por la mira del rifle, que hubo un sólo disparo, que R.M.L. no continuó agrediéndolo ni disparándole y que su reacción fue de sorpresa e incredulidad*. Además, *R.M.L. no se escondió ni huyó del lugar, que cuando R.M.L. salió de su casa lo hizo para ayudarlo y que no hubo amenaza ni rencor, incluso R.M.L. se disculpó con Matos Pérez por lo sucedido*. (Énfasis nuestro. E.P.P., a la pág. 5.)

El Dr. Oscar Abriles explicó el tratamiento que le suministró a Matos Pérez y la posterior intervención ambulatoria para extraerle el balín de su cuero cabelludo. En el contrainterrogatorio, el Dr. Abriles dijo que el impacto del balín no afectó el cerebro de Matos Pérez, que el balín no llegó al hueso del cráneo, no hubo fracturas ni se afectaron sus cinco sentidos ni sus órganos ni extremidades ni le provocó incapacidad física ni limitación de movimiento alguna. Específicamente, el Dr. Abriles señaló que el balín era redondo y estaba en el cuero cabelludo, pero no penetró y podía salir por sí sólo aunque recomendó extraerlo por la molestia que provocaba al paciente. (E.P.P., a las págs. 5-6.)

La experta en balística Carmen Suliveres *calificó el arma como un rifle neumático capaz de disparar*, tipo Benjamín Franklin calibre BB 4.5 mm comparable con una bala calibre 22 por su fuerza, que es capaz de producir la muerte. Señaló, además, que *a una distancia de 125 pies con un bombeo completo (sic)*, el rifle tiene fuerza para penetrar hasta 1 pulgada y que el uso de ese tipo de arma lo determina quien la maneja, toda vez que su efectividad depende del uso, la distancia y cómo se carga. En el contrainterrogatorio, *la experta reiteró que el rifle no es un arma de fuego, sino un arma neumática*. (Énfasis nuestro. E.P.P., a la pág. 6.)

Luego de aquilatar la prueba, el foro primario declaró a R.M.L. incurso en las faltas imputadas, con las medidas dispositivas ya descritas. Inconforme, el menor apela ante nos.

## II

De ordinario, se nos exige que guardemos deferencia hacia las determinaciones de hechos de los tribunales de primera instancia y que no descartemos la apreciación particular que los foros primarios hacen de la prueba oral presentada y admitida en juicio. No obstante, se nos permite intervenir con esa apreciación si el foro primario actuó con pasión, prejuicio o parcialidad, o si cometió un error manifiesto al aquilatarla. *Meléndez v. Caribbean Int'l News*, 151 D.P.R. 649, 664 (2000); *Quiñones López v. Manzano Pozas*, 141 D.P.R. 139, 152 (1996).

Se excluyen de esta regla de deferencia las determinaciones de hechos que se basan exclusivamente en prueba documental o pericial. Ante este tipo de prueba, el tribunal apelativo está en idéntica posición que el tribunal inferior. También está en igual posición para examinar la corrección de las conclusiones de derecho contenidas en el dictamen apelado. *Sepúlveda v. Depto. de Salud*, 145 D.P.R. 560, 573, n.13 (1998); *Díaz García v. Aponte Aponte*, 125 D.P.R. 1, 13-14 (1989); *Abudo v. Autoridad*, 105 D.P.R. 728, 731 (1977).

Aunque no podemos obviar estas limitaciones en nuestra gestión apelativa, en el caso de autos nos enfrentamos a una cuestión mixta de hecho y de derecho. *"[L]a determinación de si se probó la culpabilidad del acusado fuera de duda razonable es revisable en apelación; ello es así pues la apreciación de la prueba desfilada en un juicio es un asunto combinado de hecho y derecho." Pueblo v. Irrizarry Irrizary*, res. el 10 de mayo de 2002, 156 D.P.R. \_\_\_\_ (2002), **2002 J.T.S. 68**, a la pág. 1109. En este caso, dijo el Tribunal Supremo que:

*"[A]un cuando nuestra función revisora, como previamente señaláramos, tiene ciertas limitaciones, ello no implica que el foro contra cuyo dictamen se recurre está exento de errar como tampoco supone que, en el afán de ceñirnos a la doctrina de la deferencia, permitiremos que prevalezca un fallo condenatorio incluso estando convencidos de que un análisis integral de la prueba no establece la culpabilidad del acusado más allá de duda razonable. Nosotros, al igual que el foro recurrido, tenemos no sólo el derecho, sino el deber de tener la conciencia tranquila y libre de preocupación."*

[Énfasis nuestro. Citas omitidas.] *Pueblo v. Irrizarry Irrizary,* **2002 J.T.S. 68**, a la pág. 1110.

A la luz de estos principios, hemos examinado la transcripción de la prueba oral y la prueba documental ofrecida y estipulada por ambas partes y resolvemos revocar la resolución apelada, porque en las circunstancias del caso de autos no se configuraron los elementos del delito de agresión agravada que tipifica el Artículo 95, según enmendado

*"A.      Primer error: el elemento de intención en la comisión de una falta por agresión agravada y la evidencia necesaria para probarlo"*

El Artículo 94 del Código Penal de 1974 establecía el tipo de conducta que constituia una agresión punible. Este artículo imponía responsabilidad penal por agresión a *"toda persona que empleare fuerza o violencia contra otra para causarle daño"*. El Artículo 95, según enmendado por la Ley 10 de 1983, describía la agresión agravada como delito grave, *"cuando se infiere grave daño corporal a la persona agredida"* y *"cuando se cometiere con armas mortíferas en circunstancias que no revistiesen la intención de matar o mutilar"*. (Énfasis nuestro.)

Así, los elementos constitutivos de la falta de agresión agravada imputada a R.M.L. eran: emplear *fuerza o violencia* contra una persona, con la *intención* de causarle daño mediante el uso de un *arma mortífera*, siempre que las circunstancias no configurasen la intención de matar o mutilar al agredido, o haberle inferido grave daño corporal.

Al considerar el primer señalamiento de error, evaluamos el tipo de intención que requería la norma punitiva para configurar la falta o el delito de agresión agravada mediante el uso de un arma mortífera. Somos de opinión que los hechos no configuran fuera de duda razonable *esa intención específica*.

La intención criminal o la *mens rea* es el elemento anímico que antecede la actividad delictiva; se produce en la mente del acusado y se traduce como voluntad de actuar. Para que la conducta imputada sea intencional se requiere que el acusado anticipe el resultado de su acción u omisión y actúe de conformidad o, aunque no quiera el resultado punible, que pueda prever las consecuencias naturales o probables de su acción u omisión. Artículo 15 del Código Penal de Puerto Rico de 1974, 33 L.P.R.A. sec. 3062.

El Código Penal de 1974 disponía en su Artículo 14: *"Nadie podrá ser sancionado por una acción u omisión que la ley provee como delito si la misma no se realiza con intención o negligencia criminal."* A renglón seguido, el mismo artículo identificaba los elementos de los que podía deducirse la intención o negligencia criminal del imputado: *"las circunstancias relacionadas con el delito, la capacidad mental y las manifestaciones y conducta de la persona"*. 33 L.P.R.A. sec. 3061.

Aunque el elemento mental es subjetivo, puede inferirse de las circunstancias pertinentes retrospectivas, de las concomitantes e, incluso, de aquellas posteriores a la comisión del delito o falta *"que tienden a demostrar una determinada intención o negligencia."* Dora Nevares-Muñiz, *Derecho Penal Puertorriqueño: Parte General*, San Juan, 1983, pág. 165.

Sobre este aspecto, el Tribunal Supremo ha expresado que *"en aquellos casos donde se imputa un delito de intención específica y donde no existen manifestaciones del imputado que reflejen su estado anímico al momento de cometer los hechos, el ministerio público depende de la prueba relacionada con las circunstancias en que se comete el delito para probar el elemento de la intención criminal. Esto es, la intención criminal se evalúa en virtud de los hechos pertinentes anteriores, concomitantes y posteriores del caso"*. [Citas omitidas. Énfasis nuestro.] *Pueblo v. McCloskey Díaz*, res. el 8 de marzo de 2005, 164 D.P.R.___ (2005), **2005 J.T.S. 32**, a la pág. 817.

Por otro lado, el Tribunal Supremo ha definido *"arma mortífera"* como *"aquel instrumento que cause la muerte o grave daño corporal al ser usado del modo corriente y usual que su forma y construcción revela."* *Pueblo v. Dávila*, 23 D.P.R. 337, 338 (1915). Es decir, las armas de fuego son armas mortíferas para propósitos del Artículo 95, si se usan como tales, por ejemplo, que estando cargadas, se hale el gatillo para expeler el proyectil. Véase, *Pueblo v. Haddock*, 43 D.P.R. 752, 753 (1932).

Por otro lado, la culpabilidad, que sólo es dable cuando concurren todos los elementos del delito imputado, tiene que demostrarse fuera de duda razonable, de acuerdo al estándar de prueba en los casos criminales. La Constitución de Puerto Rico dispone que *"[e]l precepto constitucional que garantiza al acusado la presunción de inocencia exige que toda [condena] siempre esté sostenida por prueba que establezca más allá de duda razonable todos los elementos del delito y la conexión del acusado con los mismos"*. Art. II, sec. II, Const. E.L.A.; *Pueblo v. Bigio Pastrana*, 116 D.P.R. 748, 760-61 (1985). Ello implica que ante la duda, prevalecerá la presunción de inocencia y procederá la absolución del acusado. Dora Nevares-Muñiz, *Op. Cit.*, pág. 164; *Pueblo en interés del menor F.S.C.*, 128 D.P.R. 931, 944 (1991).

Asimismo, el Tribunal Supremo ha reiterado que la prueba para inculpar a un acusado tiene que ser suficiente en Derecho, al extremo de producir *"certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido."* *Pueblo v. Rodríguez Román*, 128 D.P.R 121, 130 (1991); *Pueblo v. Carrasquillo Carrasquillo*, 102 D.P.R. 545, 552 (1974). El estándar de duda razonable no quiere decir que la *"culpabilidad del acusado tenga que establecerse con certeza matemática, sino que la evidencia establezca aquella certeza moral que convence, dirige la inteligencia y satisface la razón."* *Pueblo v. Meléndez Rodríguez,*

136 D.P.R. 587, 620 (1994); *Pueblo v. Bigio Pastrana*, 116 D.P.R., a la pág. 761.

En las querellas contra los menores de edad se exige el mismo estándar de prueba que en los casos criminales contra adultos. Regla 7.7 de las Reglas de Procedimiento para Asuntos de Menores, 34 L.P.R.A. Ap. I-A, R. 7.7. Una amplia jurisprudencia ha enfatizado que a los menores les asisten las mismas garantías constitucionales de los adultos, siempre que ello les asegure un trato justo y el debido procedimiento de ley, y no se desvirtúe la naturaleza especial del sistema de justicia juvenil. Art. II, sec. II, Const. E.L.A.; *Pueblo en interés del menor N.O.R.*, 136 D.P.R. 949, 955 (1994). ■

En virtud de estos principios, hemos examinado con detenimiento la exposición narrativa estipulada de la prueba oral en el caso de autos. Después de un análisis objetivo e integral de todos los testimonios y de sus contradicciones, concluimos que la prueba que presentó la Procuradora de Asuntos de Menores no demostró fuera de duda razonable la *"culpabilidad"* de R.M.L. por la falta de agresión agravada, en ninguna de las dos modalidades del Artículo 95 del Código Penal de 1974.

La Procuradora venía obligada a probar todos los elementos de la agresión agravada, según estaban tipificados en ese artículo, de modo que el juzgador pudiera concluir, *fuera de duda razonable*, que R.M.L. cometió la falta imputada. La Procuradora, sin embargo, no probó el elemento de la intención específica que requiere la falta imputada; es decir, la intención de R.M.L. de ocasionar grave daño corporal al joven perjudicado o por la modalidad que se refiere al uso de un arma mortífera para cometer un delito. Por tanto, al no derrotarse la presunción de inocencia, debió el tribunal desestimar la querella contra el menor R.M.L.

Los hechos de este caso son definitivamente muy distintos a los que presenta el precedente citado por el Procurador General, *Pueblo v. Felicier Villalongo*, 105 D.P.R. 600 (1977), como vinculante para el caso de autos. Veamos.

En cuanto a las *circunstancias retrospectivas o anteriores al incidente*, nótese que la víctima, el joven Matos Pérez, durante su testimonio reiteró en varias ocasiones que no tenía ningún problema con R.M.L. Incluso, en los instantes precedentes al incidente, R.M.L. no lo amenazó ni hubo comunicación alguna entre ellos. Esto fue reiterado por el testigo y amigo de Matos Pérez, Yamil López Pérez, quien dijo que R.M.L. no hizo ninguna manifestación ni discutió con Matos Pérez al momento del incidente. Notamos que *el testimonio de este testigo fue contradictorio*. Su declaración durante el directo de la procuradora fue un tanto descriptiva de asuntos que luego, en el contrainterrogatorio, negó que ocurrieran o trató de matizar. No pasamos por alto que admitió que Mato~ ~ ~~ ~ *"refrescó la memoria"* sobre lo que había ocurrido. Sin embargo, al ser confrontado con su prime~ ~ersión, nos percatamos de que no fue propiamente un testigo ocular de todo el evento o, al menos, no pudo afirmar con certeza que fue R.M.L. quien le disparó a Matos Pérez. Incluso, declaró que éste entró voluntariamente a la residencia de R.M.L. luego del incidente y que nunca estuvo inconsciente. (Énfasis nuestro. E.E.P., a la pág. 4.)

Aunque en su alegato el Procurador General arguye que el elemento intencional antes de los hechos se probó cuando R.M.L. *"apuntó el rifle contra Matos Pérez,"* lo cierto es que de la exposición narrativa estipulada no surge con claridad cómo R.M.L. disparó el arma en el momento en que Matos Pérez pasó frente a su casa. Los dos jóvenes-testigos *"oculares"* ofrecieron *versiones-contradictorias*. Además, la agente Serrano dijo, a base de su investigación, que Matos Pérez le contó que R.M.L. no le apuntó por la mira del rifle, que no le dijo que se parara, ni le hizo ninguna expresión o manifestación, ni lo amenazó. (E.E.P., pág. 5.)

El rifle del caso de autos es neumático y, según la experta en balística, para disparar ese tipo de arma es necesario bombearla (*sic*) completamente. De la exposición narrativa surge que R.M.L. no bombeó (*sic*) el arma para ponerla en condiciones de disparar, ni antes ni en el momento en que Matos Pérez pasaba frente a la casa. Los testigos corroboraron mutuamente que R.M.L. no usaba el arma en los alrededores ni lo vieron

manipulándola previamente para su uso en fecha u hora cercana a los sucesos. El testimonio de la experta en balística no arrojó luz sobre el estado del arma cuando fue ocupada, es decir, sobre si aparentaba estar habilitada o no para ser disparada. Su testimonio fue más hipotético que real. La lectura cuidadosa de la exposición narrativa demuestra que R.M.L. no realizó ningún acto preparativo para agredir a Matos Pérez ni tenía motivos para ello.

Respecto a las *circunstancias concomitantes o simultáneas al incidente*, el Procurador General alega que el hecho de dispararle a Matos Pérez y herirlo en la cabeza demostró el elemento intencional de R.M.L. durante el incidente. Al evaluar la prueba presentada, sin embargo, se desprende que R.M.L. no apuntó consciente o deliberadamente el arma contra Matos Pérez, ni la bombeó (*sic*), ni la cargó, ni emitió expresión agresiva, amenazante o de advertencia alguna. Notamos que el perjudicado Matos Pérez admitió en el contrainterrogatorio *que no hubo comunicación alguna entre ellos*, y que nunca pensó que le iba a disparar, aunque en el directo declaró que le dijo a R.M.L. que no le disparara.

Sobre las *circunstancias prospectivas o posteriores*, el Procurador General alega que, luego de herir a Matos Pérez, R.M.L. temió que lo acusaran y refirieran a la policía y por eso insistió en brindarle los primeros auxilios al herido. Lo anterior, sin embargo, no es el comportamiento usual de una persona que tuvo la intención de provocar daño a otra. Por el contrario, la reacción fue propia de un adolescente que quedó tan sorprendido como la alegada víctima por lo ocurrido. Esto quedó evidenciado con el testimonio de López Pérez, quien dijo que vio salir a R.M.L. de su casa "*sorprendido y azorado*" y que luego lo escuchó decirle a Matos Pérez que quería curarlo. La exposición narrativa señala que R.M.L. no se escondió ni huyó de la escena del incidente; que trató de ayudar a Matos Pérez, cuando lo vió sangrando; que llevó a Matos Pérez a su casa para curarlo.

De todo lo antes dicho se desprende que la Procuradora de Asuntos de Menores no probó el elemento de intención específica que requiere la imputación de una falta por agresión agravada bajo el Artículo 95 del Código Penal de 1974. Es nuestra opinión que la prueba de cargo fue insuficiente y no satisfizo el *quántum* de prueba requerido respecto a todos los elementos que exige la falta imputada.

Para evaluar adecuadamente la prueba presentada, el juzgador requiere tanto de la experiencia adquirida como de su conocimiento del Derecho, elementos esenciales para llegar a una solución justa. *Pueblo v. Irizarry Irizarry*, **2002 J.T.S. 68**, a la pág. 1109. Luego de examinar la totalidad de las circunstancias, desde la óptica apelativa, consideramos que procede la revocación de la sentencia apelada; ello por razón de que no se demostró fuera de duda razonable que el menor R.M.L. agredió a Matos Pérez *con un arma mortífera de manera intencional* para causarle grave daño corporal. El foro apelado cometió el primer error señalado.

Veamos el segundo señalamiento.

"*B. Segundo error: la querella por la portación ilegal de un arma de fuego violenta el principio de legalidad.*"

La querella es el documento que contiene la alegación formal del Estado contra el menor que delinque y describe los hechos que constituyen la falta imputada. La querella equivale al pliego acusatorio en el procedimiento criminal ordinario. Regla 3.1 de las Reglas de Procedimiento para Asuntos de Menores, 34 L.P. R.A. Ap. I-A, R. 3.1; *Pueblo en interés del menor R.F.C.*, 130 D.P.R. 100, 109 (1992) (Sentencia).

De conformidad con la Regla 3.1 de las Reglas de Procedimiento para Asuntos de Menores, la querella debe contener los siguientes datos:

"[...]

*(g) Falta imputada y su clasificación.*

*(h) Relación de los hechos constitutivos de la falta, fecha y lugar en que éstos ocurrieron.*

*[...]".*

34 L.P.R.A. Ap. I-A, R. 3.1.

La Regla 3.2 del mismo cuerpo reglamentario, dispone lo siguiente sobre la querella:

*"(a) La querella se redactará en lenguaje sencillo y contendrá una exposición sucinta de los hechos constitutivos de la falta que se imputa al menor.*

*(b) Las palabras usadas en la querella se interpretarán en su acepción usual, con excepción de las palabras y frases definidas por las secs. 2201 et seq. de este título. No se considerará insuficiente una querella por omisión de algún dato o por causa de algún defecto de forma que no perjudique los derechos sustantivos del menor."*

34 L.P.R.A. Ap. I-A, R. 3.2.

La Regla 3.2 está redactada a tenor de la Regla 35(c) de las Reglas de Procedimiento Criminal, 34 L.P.R.A. Ap. II, R. 35 (c), y procura cumplir con el mandato que establece el Artículo II, Sección 11 de la Constitución del Estado Libre Asociado de Puerto Rico. En armonía con el principio de rango superior, el Artículo 8 del Código Penal dispone que:

*"No se instará acción penal contra persona alguna por un hecho que no esté expresamente definido por la ley como delito, ni se impondrán penas o medias de seguridad que la ley no hubiere previamente establecido.*

*No se podrán crear por analogía delitos, penas, ni medidas de seguridad."*

33 L.P.R.A. sec. 3031.

Esta norma reconoce el principio de legalidad, postulado esencial del procedimiento criminal en nuestro sistema de justicia, que establece que la querella o acusación no pueden carecer de los elementos esenciales del delito o la falta imputada. Esta deficiencia no puede subsanarse mediante la prueba que posteriormente se ofrezca en el correspon~~___~~ ~~_e_~~ procedimiento criminal. *Pueblo v. De Jesús Rosado*, 100 D.P.R. 536, 538 (1972). Incluso, cuando existe conflicto entre el delito imputado en la acusación y los hechos probados en el caso criminal, estos últimos prevalecen. *Pueblo v. Candelario Couvertier*, 100 D.P.R. 159, 161-162 (1971).

Es decir, aunque no es esencial que la querella o acusación utilicen estrictamente las palabras empleadas en la ley, si se omite un elemento constitutivo del tipo legal de la falta imputada, entonces la querella o el pliego acusatorio serían insuficientes y, como tales, desestimables. No así si solo presentan un defecto de forma. Regla 6.2 (1) de las Reglas de Procedimiento para Asuntos de Menores, 34 L.P.R.A. Ap. I-A, R. 6.2(1); Nevares-Muñiz, *Derecho de Menores*, 2da ed. rev., 1994, pág. 78; *Pueblo v. Calviño Cereijo*, 110 D.P.R. 691, 693-694 (1981); *Pueblo v. Santiago Cedeño*, 106 D.P.R. 663, 666-667 (1978).

En el caso que nos ocupa, al menor R.M.L. se le imputó una falta por violar el Artículo 5.04 de la Ley de Armas, que dispone:

*"Toda persona que **transporte cualquier arma de fuego o parte de ésta, sin tener una licencia de armas, o porte cualquier arma de fuego sin tener su correspondiente permiso para portar armas,** incurrirá en delito*

*grave y convicta que fuere, será sancionada con pena de reclusión por un término fijo de diez (10) años. [...]*

*Cuando el arma sea una neumática, de juguete o cualquier imitación de arma y **ésta se portare o transportare con la intención de cometer delito o se usare para cometer delito**, la pena será de reclusión por un término fijo de cinco (5) años. [...]".*

[Énfasis nuestro.] Ley de Armas, 25 L.P.R.A. sec. 458c.

Este artículo prohíbe la transportación o portación de un arma en dos modalidades. Bajo la primera modalidad, el Ministerio Público viene obligado a alegar en la querella y presentar evidencia tendente a demostrar fuera de duda razonable dos hechos: (1) que el acusado portaba un *arma de fuego*; y (2) que *no tenía licencia* para portarla. Bajo la segunda modalidad, el Ministerio viene obligado a alegar en la querella y a probar fuera de duda razonable lo siguiente: (1) que el acusado portaba un *arma neumática*; y (2) que lo hacía con la *intención de cometer una falta o la había usado para cometer una falta*.

La Ley de Armas define *arma de fuego* como *"cualquier arma, sin importar el nombre por el cual se conozca, capaz de lanzar una munición o municiones por acción de una explosión."* Artículo 1.02 de la Ley de Armas de Puerto Rico, 25 L.P.R.A. sec. 455(e). La ley también define *arma neumática* como *"cualquier arma, sin importar el nombre por el cual se conozca, que mediante la liberación de gas o mezcla de gases comprimidos es capaz de impulsar uno o más proyectiles."* Artículo 1.02 de la Ley de Armas, 25 L.P.R.A. sec. 455(g).

Veamos lo que dice la querella:

*"El referido menor en la hora, fecha y lugar arriba indicados, que forma parte de la jurisdicción del Tribunal de Primera Instancia de Puerto Rico, Sala Superior de Bayamón, Asuntos de Menores, ilegal, voluntaria y maliciosamente, PORTABA sobre su persona y dominio un arma de fuego, Rifle de Pellets, cargado, cañón negro, cachas color marrón y accionado por aire, sin haber obtenido una licencia conforme [sic] lo autoriza la Ley; la misma fue utilizada en la comisión del delito de Agresión Agravada Grave contra la persona de Jaime Matos Pérez. El arma fue ocupada."*

[Énfasis suplido.] Apéndice del recurso, a la pág. 5.

Nótese que la querella hace referencia a que el menor portaba un *arma de fuego... sin tener una licencia para ello*, al mismo tiempo que describe la portación *del rifle de pellets... y que fue utilizado para la comisión de un delito*, lo cual implica una total confusión de los elementos de una y de otra modalidad del Artículo 5.04 de la Ley de Armas. No es la querella el *"mejor modelo de redacción"*, pero leída íntegramente imputó válidamente a R.M. L. la falta por la segunda modalidad del Artículo 5.04. *Pueblo v. Felicier Villalongo*, 105 D.P.R., a la pág. 604.

██

No hay duda de que R.M.L. tenía en su posesión un rifle de perdigones (*pellets*). La dificultad recae sobre el segundo elemento necesario para configurar el delito de agresión agravada grave, por la modalidad del arma neumática: que la usó para cometer el delito de agresión agravada.

Aunque el texto confuso e incoherente de la querella no viola el principio de legalidad, —es fácil para una persona de inteligencia común deducir que un rifle de *pellets* es efectivamente el arma neumática que describe el artículo 5.04 de la Ley de Armas, aunque la querella lo clasifica como arma de fuego—, no es necesario extendernos en este análisis para resolver el recurso por esta falla procesal.

El escrutinio obligado de esta controversia nos lleva a la discusión del primer error. La mera posesión, portación o transportación de un arma neumática no es delito, a tenor del Artículo 5.04 de la Ley de Armas. Sería

una falta si "*se portare o transportare con la intención de cometer delito o se usare para cometer delito*". Si el Ministerio Público no probó la intención de R.M.L. de hacer daño al perjudicado, no podía sostenerse la querella contra él bajo la modalidad de que portaba el rifle y que cometió con él el delito de agresión agravada.

Es decir, si concluimos que El Pueblo no probó la intención de R.M.L. de cometer el delito de agresión agravada en la persona de Jaime Matos Pérez, no puede prevalecer la denuncia de falta por esta segunda querella. La comisión de la falta o delito con el rifle neumático era un elemento esencial de la segunda querella y debió probarse también fuera de duda razonable en la vista adjudicativa.

Por los fundamentos expuestos, procede la revocación de la sentencia apelada.

Lo acordó el Tribunal y certifica la Secretaria del Tribunal. La juez Cotto Vives disiente sin opinión escrita.

Laura M. Vélez Vélez
Secretaria del Tribunal de Apelaciones